**DEPARTMENT OF PUBLIC WELFARE, Petitioner,**

v.

**PRESBYTERIAN MEDICAL CENTER OF OAKMONT and Presbyterian Medical Center of Oakmont, Pennsylvania, Inc., Respondents.**

Commonwealth Court of Pennsylvania.

Argued Feb. 5, 2003.

Decided May 15, 2003.

Reargument Denied July 9, 2003.

Jason W. Manne, Pittsburgh, for petitioner.

Louis J. Capozzi, Jr., Harrisburg, for respondents.

BEFORE: COLINS, President Judge, McGINLEY, Judge, PELLEGRINI, Judge, LEADBETTER, Judge, COHN, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge McGINLEY.

The Department of Public Welfare (DPW) petitions for review of a Board of Claims' decision to award Presbyterian Medical Center of Oakmont and Presbyte-

rian Medical Center of Oakmont, Pennsylvania, Inc. (Oakmont) $311,324.00 plus pre-judgment and post-judgment interest as a result of DPW audits of Oakmont's reimbursement under medical assistance.

DPW issued a series of audit reports establishing Oakmont's reimbursement under the medical assistance program. Oakmont filed administrative appeals contesting certain payment reimbursements with DPW's Bureau of Hearings and Appeals (BHA). Then Oakmont filed three claims [1] before the Board of Claims. In 1996, Oakmont withdrew two of its administrative claims with the BHA and proceeded with its claims before the Board of Claims. Hearings were held in July 1999.

Oakmont is a licensed nursing facility, which participated in the medical assistance program.[2] Prior to 1996,[3] DPW reimbursed nursing facilities based on a retrospective cost-based reimbursement system. Payment rates were limited by certain DPW regulations at issue here known as the "$22,000/bed cap"[4] and the "moratorium."[5]

Under the retrospective cost-based system, DPW made interim payments to the nursing facility during the fiscal year. At the close of the fiscal year the nursing facility filed a cost report with DPW and identified the costs incurred during that year. DPW audited the cost report and in accordance with DPW regulations determined the nursing facility's allowable costs, payment rates and reimbursement. DPW issued an audit report and a final cost settlement, reconciling the nursing facility's interim·payments with its audited payment rates.

In this controversy, Oakmont disagreed with the audit results. Oakmont contended that DPW erred when it applied the "moratorium" to its movable equipment costs. In 1984, Oakmont had undertaken a construction project and added sixty-eight (68) new beds to the facility. Oakmont used existing movable equipment and purchased more than $450,000 in new movable equipment. DPW determined the 68 new beds were subject to the "moratorium." DPW disallowed the related depreciation and capital interest costs including the depreciation and interest on the movable equipment. DPW calculated this figure using a ratio of 68 unallowable beds to 202 total beds.

Oakmont also contested DPW's refusal to classify $7,466 in interest expense for 1995. In prior years DPW reclassified the interest to working capital. However, in

1. Oakmont filed three claims before the Board of Claims: (1) March 9, 1995, disputing DPW's reimbursement for 1990, 1991, and 1992; (2) May 23, 1996, disputing DPW's reimbursement for 1994; and (3) November 13, 1997, disputing DPW's reimbursement for 1995.

2. As a participant, Oakmont signed a provider agreement. In 1990, the provider agreement directed that DPW pay in accordance with its regulations. In the early 1990's, DPW replaced this provider agreement. For all other periods at issue, Oakmont's provider agreement consisted of a one-page enrollment with no payment terms.

3. After January 1996, DPW's reimbursement system changed to the case-mix system. The case-mix system does not apply in this case.

4. The "$22,000/bed cap" limited allowable depreciation and capital interest costs to a maximum construction cost per bed of $22,000. 55 Pa.Code §§ 1181.65(c)(4); 1181.259(s); 1181.260(k).

5. The "moratorium" generally precluded recognition of any depreciation and capital interest costs related to "new or additional beds" constructed pursuant to a certificate of need or letter or nonreviewability dated after August 31, 1982 unless the beds were considered "replacement beds." 55 Pa.Code §§ 1181.65(c)(1); 1181.259(r); 1181.260(a).

1994, Oakmont refinanced its bonds and DPW's auditor decided to validate the propriety of the reclassification. Oakmont could not demonstrate why the interest should be reclassified, so the auditor did not reclassify the interest for 1995. DPW discovered in a post-audit review that Oakmont overbilled the medical assistance with respect to certain laundry services. The parties agreed that the issues related to laundry costs were not before the Board of Claims. Oakmont then filed a motion with the Board of Claims seeking a protective order against any recoupment of funds.

The Board of Claims made the following relevant conclusions of law:

1. The Board of Claims has jurisdiction over the subject matter of this action

. . .

2. DPW consented to the formation of a contractual relationship between itself and Oakmont.

. . . .

5. Depreciation and capital interest reimbursement on movable equipment is not subject to a moratorium pursuant to 55 Pa.Code Section 1181.65 and is, therefore, due and owing.

. . . .

7. DPW wrongfully reclassified working capital interest to capital interest in 1995.

. . . .

11. Pre-judgment interest shall be awarded on all matters presently pending before the Board of Claims relative to this case.

. . . .

13. Post-judgment interest is hereby awarded on all matters pending before the Board of Claims relative to this issue.

14. The defenses of recoupment, mistake and off-set are affirmative defenses that must be clearly stated in New Matter or they are waived. *Household Consumer Discount Co. v. Vespaziani*, 490 Pa. 209, 415 A.2d 689 (1980) Pa.R.C.P. 1032 (a).

15. The defenses of recoupment, mistake and off-set are hereby waived; moreover, to permit them would be highly prejudicial to the Claimant, Oakmont.

. . . .

17. DPW failed to adequately plead that the interest income generated from the Debt Service Reserve Fund should be used to off-set Oakmont's capital interest reimbursement and is, therefore, barred from raising that as an issue.

Board of Claims Opinion, April 17, 2001, Conclusions of Law 1–2, 5, 7, 11, 13–15, 17 at page 13–14.

On appeal,[6] DPW initially raises the question of whether the Board of Claims has jurisdiction when the issues involve the interpretation and application of DPW regulations.

DPW argues that the Board of Claims lacks subject matter jurisdiction. DPW contends this is a rate setting dispute and outside of the Board of Claims' jurisdiction because it does not arise from contract. Oakmont cites no provision of its provider agreement in support of its claims. Rather, Oakmont asserts DPW has breached its obligation to pay Oakmont by not following its regulations.[7]

---

**6.** Our standard of review is limited to determining whether constitutional rights have been violated, whether an error of law has been committed or whether necessary findings of fact are supported by substantial evidence. *Shovel Transfer and Storage Inc. v. Pennsylvania Liquor Control Board*, 559 Pa. 56, 739 A.2d 133 (1999).

**7.** In November 2002, the Pennsylvania State Legislature enacted Act 142–2002(Act) and

In determining whether the Board of Claims has subject matter jurisdiction, we are guided by our recent decision in *Pennsylvania Department of Public Welfare v. Riverstreet Associates*, 798 A.2d 260 (2002). In *Riverstreet*, a nursing home facility had challenged peer group prices and payment rates issued by DPW for payment to Riverstreet. Riverstreet alleged that DPW breached its contract when it set its peer group prices and payment rates. This Court found that the Board of Claims did not have subject matter jurisdiction. The dispute centered on the meaning and interpretation of DPW regulations, not whether DPW breached the provider agreement by not following its regulations. "At issue is a complicated method of establishing payment rates and setting payment rates. This is within the specific expertise and delegated legislative authority of DPW." *Riverstreet*, 798 A.2d at 264. This Court finds the current controversy similar to the *Riverstreet* dispute. Here, as in *Riverstreet*, Oakmont challenges DPW's application of its regulations arguing it made erroneous audit adjustments and therefore failed to make certain payments to Oakmont.[8]

Oakmont's claim does not sound in contract. "[T]he jurisdictional predicate is satisfied only when the claimant relies upon the provisions of that contract in asserting the claim against the Commonwealth." *Keenheel v. Pennsylvania Securities Commission*, 523 Pa. 223, 227–228, 565 A.2d 1147, 1149 (1989). To determine whether the Board of Claims has jurisdiction the focus must be on the nature of the underlying claims and not the mere existence of a contractual relationship between the parties. *Yurgosky v. Administrative Office of Pennsylvania Courts*, 554 Pa. 533, 722 A.2d 631 (1998). Here, as in *Riverstreet*, Oakmont's claims derive from DPW regulations and not from issues of contract. Consequently, we find no jurisdiction with the Board of Claims.

Accordingly, we vacate and dismiss this action.[9]

provided that all medical assistance provider reimbursement disputes shall be heard by DPW's Bureau of Hearings and Appeals (BHA) and the Board of Claims shall not have subject matter jurisdiction. Under the terms of the Act the Board of Claims shall continue to have jurisdiction until DPW publishes a standing practice order for proceedings, this standing order must be issued by July 1, 2003. Once that standing order is issued, the Board of Claims Act is repealed and replaced with a new Chapter 17 of the Procurement Code governing the Board of Claims. The Board of Claim's jurisdiction over claims for payment or damages to providers of medical assistance services is abolished.

8. In *Department of Public Welfare v. Divine Providence Hospital*, 516 A.2d 82 (Pa.Cmwlth. 1986), this Court noted that in certain instances DPW would have jurisdiction because of its expertise but a cause of action for breach of contract might properly be before the Board. *Divine Providence*, 516 A.2d at 84. In *Department of Public Welfare v. Shapiro*, 91 Pa.Cmwlth. 64, 496 A.2d 887 (1985), where the only question was whether DPW had received invoices, this Court found the matter was within the Board's jurisdiction. *See Smock v. Com.*, 496 Pa. 204, 436 A.2d 615 (1981)(nursing home owner's Medicaid license revoked, faced financial setbacks and sought recovery on contract theory); *Department of Public Welfare v. Maplewood Manor Convalescent Center*, 168 Pa.Cmwlth. 314, 650 A.2d 1117 (1994)(Board had jurisdiction over a claim for payment but did not have the power to alter a private settlement agreement between DPW and nursing home.).

9. Because we find that the Board of Claims does not have jurisdiction over the claims raised we need not examine whether the Board of Claims should have stayed the proceedings pending administrative appeals; whether DPW breached its contract disallowing capital costs in connection with moveable equipment with nursing facility beds constructed after August 31, 1982; whether DPW breached a contract refusing to classify interest expense as working capital; whether the

### ORDER

AND NOW, this 15th day of May, 2003, the order of the Board of Claims in the above-captioned case is vacated and the case is dismissed.

### DISSENTING OPINION BY Judge LEAVITT.

Respectfully, I dissent. With this decision, we hold for the first time that reimbursement disputes arising from a provider's agreement to deliver medical or nursing services to a Medical Assistance client must be heard exclusively by the Department of Public Welfare (DPW). In doing so, we divest the Board of Claims of jurisdiction over provider reimbursement claims, even though its jurisdiction over such claims has been expressly recognized by DPW since at least 1981.[1]

The Board of Claims is a venerable institution that was created in 1937 to "arbitrate claims against the Commonwealth arising from contracts entered into by the Commonwealth...." Section 1 of the Act of May 20, 1937, P.L. 728, *as amended*, 72 P.S. § 4651-1. DPW has recently revised its standard provider agreement from a document of many pages to a shorter one that it calls an "enrollment form." However, the length or shape of a document is irrelevant to a determination of the kind of legal relationship it establishes between two parties.[2] The provider agreement is an adhesion contract that was prepared by DPW and imposed upon the provider, *i.e.*, the weaker party who has no choice about

its terms. Black's Law Dictionary, 318–319 (7th ed.1999). It evidences, nevertheless, a contractual relationship.

The contractual nature of the relationship between Oakmont and DPW is demonstrated by more than one authority. Federal regulations require a provider to have a contract with DPW in order to be able to receive payment for providing services to Medical Assistance clients. 42 U.S.C. § 1396a(a)(27); 42 C.F.R. § 431.107; 42 C.F.R. § 442.12. Recent case law is consistent with this federal statutory and regulatory authority. *See Sun Healthcare Group, Inc.*, No. CIV.A 00–986–GMS, 2002 WL 2018868 (D.Del. Sept.4, 2002); *Barnes v. Gorman*, 536 U.S. 181, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002) (wherein the Supreme Court noted that payments made to private entities for their services pursuant to Spending Clause legislation, such as the Medicaid Act, establish a contract). DPW's own regulations expressly stated that provider agreements establish a contractual relationship. 13 Pa. B. 3655 (1983).

*Department of Public Welfare v. River Street Associates*, 798 A.2d 260 (Pa. Cmwlth.2002), upon which the majority relies, is distinguishable. *River Street* was a class action that sought to change the payment rates for providers that deliver services to Medical Assistance clients of DPW that were established in DPW's regulations. We held that a challenge to the *adequacy* of those rate levels must be presented to DPW for disposition and not to the Board of Claims. Here, by contrast, we are presented with a challenge not to

---

Board of Claims erred in awarding prejudgment interest; whether the Board of Claims may prohibit DPW from reauditing a cost report including laundry costs; whether Oakmont's expert witness should have been able to testify when the Board of Claims refused to hear DPW's recoupment defense.

1. 11 Pa. B. 2630 (1981).

2. Notably, the Commonwealth Procurement Code defines "contract" as follows:

A type of written agreement, *regardless of what it may be called*, for the procurement of supplies, services or construction.

62 Pa.C.S. § 103 (emphasis added).

DPW's rate levels, but, rather, their *application* by DPW to calculate the amount owed to a particular provider under a particular contract.

It is a distinction perhaps best explained by reference to the "filed tariff doctrine." Utility rates are established by review and approval of the Public Utility Commission, and once set, they are binding on both the customer and the utility. *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission*, 808 A.2d 1044 (Pa. Cmwlth.2002). They may be challenged only in accordance with the statutory procedures governing the establishment of said rates,[3] and they may not be set aside in a breach of contract action brought in a court of law. However, if the rate has been improperly applied in an individual case, the individual rate payer may sue the utility in contract for return of an excess charge. Likewise, the utility has a contract action against the customer for any undercharge. 64 AM JUR 2D, *Public Utilities* § 62 (2001). *See e.g., American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); *West Penn Power Co. v. Nationwide Mutual Insurance Co.*, 209 Pa.Super. 509, 228 A.2d 218 (1967).

Here, Presbyterian Medical Center of Oakmont (Oakmont) does not challenge the rate level set by DPW's regulation for all providers. Rather, it challenges the amount of its particular reimbursement, which it claims has not been calculated in accordance with DPW's approved rules and rates. This is a contractual matter that can be heard by the Board of Claims. Our Supreme Court has held that the Board of Claims

provides a forum in which companies which do business with the Commonwealth and its various agencies can present contractual disputes and seek remedies for the Commonwealth's alleged breaches.

*Keenheel v. Pennsylvania Securities Commission*, 523 Pa. 223, 228, 565 A.2d 1147, 1149 (1989). Oakmont is a provider that does business with a Commonwealth agency, DPW, and it seeks redress for DPW's alleged breach of its obligation to pay for services Oakmont rendered to DPW's Medical Assistance clients.

Other cases cited by the majority are distinguishable. They do not involve payment for services rendered to the Commonwealth, and they sought relief that could not be granted by the Board of Claims.

*Keenheel* concerned the settlement of a charge of racial discrimination filed against the Pennsylvania Securities Commission by one of its former employees. The agreement to settle a violation of the Pennsylvania Human Relations Act bears no resemblance to a contract for services, which is the arrangement here. Further, Mr. Keenheel did not seek payment but, rather, sought to have the settlement nullified. The Board does not have equitable powers. Our Supreme Court appropriately held that the Board of Claims lacked jurisdiction over such a dispute because it did not originate with a contract for goods and services.

*Yurgosky v. Administrative Office of Pennsylvania Courts*, 554 Pa. 533, 722 A.2d 631 (1998), is similarly inapposite.

---

**3.** DPW's reliance upon *Ciamaichelo v. Independence Blue Cross*, 814 A.2d 800 (Pa. Cmwlth.2002) is misplaced because that case concerned whether the rates were excessive and, thereby, generating excess profits. Rate setting, whether to correct inadequate or excessive rate levels, is an activity that belongs before the appropriate state agency, in this case DPW. Here, Oakmont does not challenge the rate levels in its contract. It accepts the terms of its adhesion contract with DPW, including the payment terms. It contends, simply, that DPW has not met its obligations under that contract.

Yurgosky was a district justice who claimed that the Pennsylvania Rules of Judicial Administration required the Administrative Office of Pennsylvania Courts to provide him with a legal defense when he was charged with a crime that occurred in his official capacity. There was no jurisdiction in the Board of Claims because there was no contract; Yurgosky was a public official not a Commonwealth vendor.

On the other hand, the precedent to support the proposition that the Board of Claims has jurisdiction to consider disputes over DPW's reimbursement to medical providers that treat Medical Assistance clients is both longstanding and extensive.

In *Smock v. Com.*, 496 Pa. 204, 436 A.2d 615 (1981), our Supreme Court held that a claim for reimbursement for services rendered to Medical Assistance patients after its provider agreement with DPW was terminated should be heard by the Board of Claims. In *Department of Public Welfare v. Shapiro*, 91 Pa.Cmwlth. 64, 496 A.2d 887 (1985), DPW claimed that it had exclusive jurisdiction over Medical Assistance reimbursement disputes because its regulations governed the Medical Assistance program. This Court did not agree, holding that the Board of Claims also had subject matter jurisdiction. Again, in *Department of Public Welfare v. Maplewood Manor Convalescent Center*, 168 Pa.Cmwlth. 314, 650 A.2d 1117 (1994) we addressed the question of DPW's *exclusive* jurisdiction and, reiterating *Shapiro*, found it limited to: 1) a determination eligibility for Medical Assistance benefits, and 2) a termination of a provider's contract authority to treat Medical Assistance clients. We concluded that

"[o]therwise, the Board [of Claims] has jurisdiction over a Medical Assistance Program appeal." *Id.* at 1120, 496 A.2d 887. Thus, we held that the Board of Claims had jurisdiction over reimbursement for services rendered by a nursing home to Medical Assistance clients.

The fact that DPW's regulations[4] may affect the outcome of Oakmont's contract dispute with DPW does not divest the Board of Claims of jurisdiction. In *Shovel Transfer and Storage, Inc. v. Simpson*, 523 Pa. 235, 565 A.2d 1153 (1989), the petitioner characterized its claim as "statutory," rather than contractual, and filed a complaint with this Court. The Supreme Court reversed this Court on jurisdiction, stating that:

> The mere fact that the validity of a contract may turn upon issues of statutory duty does not create a statutory right of action. Rather, the focus is on the origin of the rights claimed. In the instant matter, Shovel's objective is to establish the contractual relationship.

*Shovel*, 523 Pa. at 241, 565 A.2d at 1156 (emphasis added). Thus, the Supreme Court held that the proper forum was the Board of Claims.

*Shovel* was consistent with this Court's prior ruling in *Department of Public Welfare v. Divine Providence Hospital*, 101 Pa.Cmwlth. 248, 516 A.2d 82 (1986) in which we held that the Board of Claims had jurisdiction over a provider reimbursement dispute even though the claim was based upon the allegation that DPW had not followed its own regulation. In short, the Board of Claims is not divested of

---

4. Oakmont's reimbursement is governed by DPW's "Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities." The terms of this Manual have been published by DPW at 55 Pa.Code §§ 1181.201–1181.274.

The majority seems to suggest that the complexity of DPW's regulations requires that Oakmont's claim be removed from the Board of Claims. However, jurisdiction of the Board of Claims is not determined on this basis. It was established to hear cases that are complex legally and factually. Indeed, because it has been deciding provider reimbursement disputes for decades, it has expertise in such claims.

jurisdiction simply because a contract dispute may involve the interpretation and application of statutes and regulations; this should not be surprising when the party purchasing goods and services is the Commonwealth.

DPW has previously sought, and failed, to have this Court reverse *Shapiro* and *Divine Providence. Department of Public Welfare v. Soffer,* 118 Pa.Cmwlth. 180, 544 A.2d 1109 (1988); *Department of Public Welfare v. Jerrytone,* 118 Pa.Cmwlth. 474, 545 A.2d 395 (1988). When litigation failed, DPW attempted to adopt regulations that would forbid providers from bringing reimbursement disputes to the Board of Claims. This proposed regulation was rejected by the Independent Regulatory Review Commission as contrary to the statute establishing the jurisdiction of the Board of Claims. 20 Pa. B. 3847–49 (1990).

For all of these reasons, the Board of Claims had jurisdiction[5] over the dispute between Oakmont and DPW on what Oakmont is owed for its services to certain Medical Assistance clients. Oakmont's claim sounds in contract. Although that contract incorporates by reference certain rate level regulations of DPW, the contract is the source of Oakmont's rights. Without a contract, it could not claim any rights to flowing under DPW's Manual for Allowable Cost Reimbursement for Skilled Nursing and Intermediate Care Facilities, 55 Pa.Code §§ 1181.201–1181.274.

Accordingly, I dissent.

Judge SIMPSON joins in this dissent.

---

**5.** The General Assembly has divested the Board of Claims of jurisdiction over the category of contract claims at issue here for the future in the event DPW issues a standing order pursuant to the Act of December 3, 2002, P.L. No. 142, consolidated at 62 Pa.C.S. § 102(e). I would not remove the 300 claims now pending in the Board of Claims.