877 A.2d 419

**DEPARTMENT OF PUBLIC WELFARE, Appellee,**

**v.**

**PRESBYTERIAN MEDICAL CENTER OF OAKMONT**
**and Presbyterian Medical Center of Oakmont,**
**Pennsylvania, Inc., Appellants.**

Supreme Court of Pennsylvania.

Argued Sept. 20, 2004.

Decided June 22, 2005.

Louis J. Capozzi, Esq., Harrisburg, for Presbyterian Medical Center of Oakmont, et al.

Kimber Lynn Latsha, Esq., Mechanicsburg, for Pennsylvania Association of Non–Profit Homes for the Aging.

Jason W. Manne, Esq., Pittsburgh, for Department of Public Welfare.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## *OPINION*

Justice SAYLOR.

This limited appeal concerns the question of whether jurisdiction over claims for reimbursement under the Pennsylvania Medical Assistance Program that were filed prior to 2003 properly lays in the Board of Claims.

Appellant, Presbyterian Medical Center of Oakmont ("Oakmont") is a non-profit operator of a licensed nursing facility in Allegheny County and an enrolled provider in the Pennsylvania Medical Assistance ("MA") Program,[1] a state plan for funding the provision of medical care and services to individuals in need of government aid, conducted with the assistance of federal funding and subject to extensive federal regulation. *See generally DPW v. Devereux Hosp. Texas Treatment Network,* 579 Pa. 313, 320–21, 855 A.2d 842, 846 (2004). Appellee, the Department of Public Welfare (the "Department" or "DPW") is the Commonwealth agency charged, *inter alia,* with administering this program. *See* 62 P.S. § 201.

In the early to mid–1990s, disputes arose concerning the Department's calculations of reimbursement payments due and owing to Oakmont for nursing care and services that it had previously provided pursuant to the MA Program. The primary substantive disagreement involved DPW's interpretation of moratorium regulations restricting payments relative to new or additional nursing facility beds, *see* 55 PA.CODE § 1181.65(c), as disallowing depreciation and interest relative to associated moveable equipment. *See DPW v. Presbyterian Med. Center of Oakmont,* 826 A.2d 34, 35 (Pa.Cmwlth.2003). Oakmont filed several statements of claim with the Board of Claims, the independent administrative board charged with arbitrating contract-based claims against the Commonwealth, pursuant to the Board's then-prevailing enabling act.[2] Each

1. *See* Act of June 13, 1967, P.L. 31 (as amended 62 P.S. §§ 441.1–449).

2. Act of May 20, 1937, P.L. 728, No. 193 (as amended and reenacted 72 P.S. §§ 4651–1–4651–10) (repealed) (the "Board of Claims Act").

claim was expressly grounded on Oakmont's applicable "provider agreement," an agreement between DPW and MA providers that is mandated by federal law, *see* 42 U.S.C. § 1396a(a)(27); 42 C.F.R. §§ 442.12, 431.107, and was styled as a contract action in order to invoke the Board of Claims' exclusive jurisdiction "to hear and determine all claims against the Commonwealth arising from contracts hereafter entered into with the Commonwealth...." *See* 72 P.S. § 4651-4 (repealed).[3] In response, DPW challenged the Board's jurisdiction to adjudicate the claims, contending that they raised solely regulatory matters, as opposed to contractual ones and, therefore, should proceed through the administrative review process. Specifically, DPW's position was that Oakmont's claims should be litigated in its Bureau of Hearing Appeals, with judicial review confined to the appeals process prescribed in the Administrative Agency Law, 2 Pa.C.S. §§ 101–754. *See* 55 Pa.Code §§ 1101.84, 1181.101.[4]

The Department's position in this regard represented a change in its policy, since previously (in the mid–1970's and through the early 1980's), it had acceded to the Board of Claims' jurisdiction over MA provider reimbursement-based claims. Indeed, in connection with its promulgation of regulations governing provider agreements, DPW explained publicly that "[t]he Department views its relationship with providers as a contractual one between buyer and seller of services with each party deciding whether or not it wishes to enter into a contract." 13 Pa. Bull. 3655 (Nov. 19, 1983). Moreover, DPW's standard form for a provider agreement mirrored this position, in that such form reflected a detailed contractual undertaking, with mutual obligations expressly stated and provisions for execution by both DPW and the MA provider. *See id.* (setting forth Department commentary to the effect

---

**3.** Each of Oakmont's statements of claim also asserted causes of action in implied contract and quasi-contract, in the alternative.

**4.** Notably, Oakmont had also lodged protective, administrative appeals in the Bureau of Hearing Appeals. Several of these, however, were withdrawn "without prejudice," apparently to forestall hearings in light of Oakmont's preference to litigate its claims in the parallel proceedings before the Board of Claims.

that "[t]he provider agreement, which is signed by all enrolled providers, reiterates this concept [of a contractual undertaking]"). DPW also advocated Board of Claims jurisdiction over MA provider reimbursement claims before this Court and in other judicial tribunals.[5]

By the late 1980s, however, DPW attempted to implement a substantial change, consistent with its present position, to reflect that provider payment disputes implicate regulatory concerns, and not contractual ones, and therefore, are not amenable to adjudication before the Board of Claims. The Department's initial efforts, however, were rebuffed in a series of decisions by the Commonwealth Court. Seminally, in *Department of Public Welfare v. Divine Providence Hospital,* 101 Pa.Cmwlth. 248, 516 A.2d 82 (1986), the Commonwealth Court rejected DPW's position that a provider claim asserting that DPW breached its provider agreement by not reimbursing it in accordance with DPW regulations represented exclusively a non-contractual, regulatory dispute.[6] *See id.* at 252, 516 A.2d at 84 (holding that the Board of Claims had jurisdiction because "this case ... concerns the question of whether DPW breached the provider agreement by not following its own regulations").[7]

5. *See, e.g., Smock v. Commonwealth,* 496 Pa. 204, 207–08, 436 A.2d 615, 617 (1981); *DPW v. Ludlow Clinical Laboratories, Inc.,* 22 Pa.Cmwlth. 614, 616, 350 A.2d 208, 209 (1976), *aff'd by equally divided Court,* 473 Pa. 299, 374 A.2d 526 (1977).

6. More specifically, the provider in *Divine Providence* claimed that DPW failed to include depreciation expenses and interest among net operating costs in cost calculations material to the reimbursement determination. *See Divine Providence,* 101 Pa.Cmwlth. at 250, 516 A.2d at 83–84.

7. *See also DPW v. Shapiro,* 91 Pa.Cmwlth. 64, 69, 496 A.2d 887, 890 (1985) (characterizing payment issues arising out of a Medicaid service provider's relationship with DPW as "simply a contractual matter"); *DPW v. Jerrytone,* 118 Pa.Cmwlth. 474, 479, 545 A.2d 395, 397 (1988) (rejecting DPW's argument that the holding of *Divine Providence* concerning the Board of Claims' jurisdiction should be overruled); *DPW v. Soffer,* 118 Pa.Cmwlth. 180, 183–84, 544 A.2d 1109, 1110–11 (1988) (same).

*Divine Providence* stopped short of holding that all provider payment disputes implicated contractual matters, distinguishing questions concerning provider breach or eligibility from the question of whether DPW breached a provider agreement by not following its own regula-

In addition to advancing its policy change before the courts, DPW took other measures in attempting to effectuate it. By the early 1990s, the Department had altered its standard provider agreement to reflect only the minimum federal requirements pertaining to record-keeping, disclosure, and compliance, omitting all provisions identifying responsibilities on DPW's part, as well as the requirement of a signature by a DPW representative.[8] DPW also began to describe the forms as enrollment forms, as opposed to contracts. Further, it attempted to promulgate regulations forbidding providers from asserting MA reimbursement challenges in the Board of Claims (although such proposed regulations were rejected by the Independent Regulatory Commission as contrary to the Board of Claims Act, see 20 Pa. Bull. 3847–49 (1990)).

DPW vindicated its position, however, in *Pennsylvania Department of Public Welfare v. River Street Associates,* 798 A.2d 260 (Pa.Cmwlth.), *appeal denied,* 569 Pa. 710, 805 A.2d 526 (2002). There, a nursing home facility challenged DPW's methodology in computing MA reimbursement rates; specifically, the facility contested the figures employed by DPW in setting certain parameters used in its case-mix reimbursement system.[9] The facility filed a class action complaint in the Board of Claims, alleging that DPW's calculations resulted in a breach of its provider agreement. The Commonwealth Court disagreed, however, adopting the Department's position that the controversy represented a regulatory, as opposed to a contractual, dispute for purposes of the Board's jurisdiction.

tions. *See Divine Providence,* 101 Pa.Cmwlth. at 252, 516 A.2d at 84; *accord DPW v. Maplewood Manor Convalescent Center, Inc.,* 168 Pa. Cmwlth. 314, 320, 650 A.2d 1117, 1120 (1994) (reiterating the *Divine Providence / Shapiro* distinction between claims involving eligibility and provider breach and other MA provider claims).

**8.** One of Oakmont's statements of claims at issue here is grounded on DPW's long-form standard provider agreement; the remainder concern periods during which Oakmont's participation in the MA Program proceeded pursuant to the abbreviated form.

**9.** The case-mix reimbursement system became effective in 1996, *see* 55 Pa.Code § 1187, replacing the retrospective, cost-based methodology that was previously employed and was applicable to the disposition of Oakmont's claims.

In reaching this conclusion, the court emphasized the requirement that, for jurisdiction to lay in the Board of Claims, the rights asserted must derive from the provisions of the contract. *See River Street*, 798 A.2d at 263 (citing *Keenheel v. Pennsylvania Securities Comm'n*, 523 Pa. 223, 228, 565 A.2d 1147, 1149 (1989) ("The jurisdiction of the Board of Claims is not triggered simply because a contract may be involved in an action, rather the jurisdictional predicate is satisfied only when the claimant relies upon the provisions of that contract in asserting the claim against the Commonwealth.")). In this regard, the court observed that the facility was able to cite no provision of the provider agreement that DPW had allegedly breached (as the provider agreement involved was DPW's short form).

*River Street* acknowledged the Commonwealth Court's previous recognition of Board of Claims jurisdiction over MA provider claims as reflected in *Divine Providence* and its progeny, but appeared to draw a distinction based on the complexity of the provider's claim. *See River Street*, 798 A.2d at 264 ("At issue is a complicated method of establishing payment rates and setting payment rates. This is within the specific expertise and delegated legislative authority of DPW."). Additionally, the court noted that its earlier line of cases all dealt with the supplanted, long form of the standard provider agreement. The Commonwealth Court concluded:

> While DPW's obligation to pay Riverstreet in accordance with law and regulation may be an implied term of the provider agreement a regulatory dispute cannot be converted into a contractual one through the device of implied terms.

*Id.* at 265 (citing *Yurgosky v. AOPC*, 554 Pa. 533, 722 A.2d 631 (1998)).

In the present case, the Board accepted jurisdiction over Oakmont's claim of MA underpayment by DPW and, after a hearing, awarded Oakmont $311,324, plus costs and interest. On appeal, however, a divided, *en banc* Commonwealth Court reversed, placing substantial reliance on *River Street* in determining that the Board of Claims lacked jurisdiction. *See*

*Oakmont*, 826 A.2d at 37 ("Here, as in *River Street*, Oakmont challenges DPW's application of its regulations arguing it made erroneous audit adjustments and therefore failed to make certain payments to Oakmont."). The majority again distinguished prior cases as involving less complex questions or matters as to which DPW's regulatory expertise was less relevant. *See id.* at 37 n. 8. Additionally, the majority invoked this Court's decisions in *Keenheel*, 523 Pa. at 227–28, 565 A.2d at 1149 ("[T]he jurisdictional predicate [of the Board of Claims' enabling act] is satisfied only when the claimant relies upon the provisions of that contract in asserting the claim against the Commonwealth."), and *Yurgosky*, 554 Pa. at 533, 722 A.2d at 631, the latter of which the court described as directing the focus to the nature of the underlying claim and not the mere existence of a contractual relationship between the parties. *See Oakmont*, 826 A.2d at 37.

Judge Leavitt dissented, joined by Judge Simpson. *See Oakmont*, 826 A.2d at 38 (Leavitt, J., dissenting). In the dissenters' view, the MA provider agreements represented the source of Oakmont's rights, and thus, the reimbursement claims asserted under such agreements fell squarely within the Board of Claims' jurisdiction. *See id.* Concerning DPW's decision to style provider agreements as enrollment forms rather than contracts, the dissenters adjudged this to be a matter of mere form over substance. *See id.* ("[T]he length or shape of a document is irrelevant to a determination of the kind of legal relationship it establishes between two parties."). In this regard, the dissent noted the federal requirement of a provider agreement as a prerequisite to MA reimbursement, as well as recent decisional law couching Medicare. and/or MA provider agreements in terms of contractual arrangements. *See id.* (citing *Barnes v. Gorman*, 536 U.S. 181, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002); *Sun Healthcare Group, Inc.*, No. CIV.A00–986–GMS, *slip op.*, 2002 WL 2018868 (D.Del. Sep. 4, 2002)).

The *Oakmont* dissent also distinguished *River Street* on the basis that the decision pertained to a class action seeking to change the payment rates for providers that deliver services

to MA clients that were established in DPW regulations.[10] The dissent characterized this as a challenge to the *adequacy* of rate levels, a matter which would pertain to all MA providers, as opposed to Oakmont's challenge, which the dissent viewed as entailing a distinct form of challenge to the *application* of rate levels by DPW to calculate the amount owed to a specific provider under a particular contract. *See Oakmont,* 826 A.2d at 38–39 (Leavitt, J., dissenting). The *Oakmont* dissenters also deemed *Keenheel* and *Yurgosky* to be distinguishable, since they did not involve payment for services rendered to the Commonwealth, and the litigants there sought relief that could not be granted by the Board of Claims. *See Oakmont,* 826 A.2d at 39–40 (Leavitt, J., dissenting). On the other hand, the dissent found the precedent supporting Oakmont's position on the Board of Claims' jurisdiction to be longstanding and extensive. *Id.* at 40–41(citing, *inter alia, Divine Providence,* 101 Pa.Cmwlth. at 248, 516 A.2d at 82); *see also supra* note 7. Relying on *Shovel Transfer and Storage, Inc. v. Simpson,* 523 Pa. 235, 565 A.2d 1153 (1989), the dissent also ascribed limited relevance to the fact that the Department's regulations would affect the outcome of Oakmont's claims. *See id.* at 241, 565 A.2d at 1156 ("The mere fact that the validity of a contract may turn upon issues of statutory duty does not create a statutory right of action. Rather, the focus is on the origin of the rights claimed. In the instant matter, Shovel's objective is to establish the contractual relationship."). Finally, the dissent noted DPW's extensive and largely unsuccessful efforts to implement a policy change that would require all MA provider reimbursement challenges to proceed through its Bureau of Hearing Appeals. *See Oakmont,* 826 A.2d at 41 (Leavitt, J., dissenting).

While *Oakmont* was pending on appeal in the Commonwealth Court, the General Assembly reconstituted the Board of Claims, *inter alia,* to divest it of jurisdiction over the relevant subject matter of MA provider reimbursement claims

---

**10.** The class action aspect of *River Street* is of no relevance, however, as a class was never certified, and all putative class members with the exception of the named plaintiff withdrew from the action at the pleading stage. *See River Street,* 798 A.2d at 261 n. 2.

and challenges.[11]  *See* 62 Pa.C.S. § 1724(c) ("The board shall have no power and exercise no jurisdiction over claims for payment or damages to providers of medical assistance services arising out of the operation of the medical assistance program").  Although the Legislature specified that the amendments were prospective, *see* Act 2002–142 §§ 21.2–22, with regard to previously filed claims, it merely indicated that they "shall be disposed of in accordance with the Board of Claims Act." *Id.* § 21.2. The enactment also implemented a specific procedure for review of MA provider reimbursement claims in the administrative setting and associated judicial review.  *See id.* § 20.1 (amending Title 67 of the Pennsylvania Consolidated Statutes by adding Sections 1101 through 1106). Finally, the Legislature conditioned the effectiveness of Act 2002–142 on the Department's publication of a standing order establishing rules governing practice before the Bureau of Hearing Appeals, *see* Act 2002–142 § 22, which DPW accomplished as of June 28, 2003.  *See* 33 Pa. Bull. 3053 (June 28, 2003).  Oakmont and the Department agree that, in light of the legislative changes, the class of cases affected by the Commonwealth Court's decisions in this case and in *River Street* is now a closed one, amounting to about 300 claims.[12] DPW also represents that, in all but approximately 20 of the 300 pending cases, the providers filed a related appeal proceeding with its Board of Hearing Appeals.

Oakmont's appeal from the Commonwealth Court's decision was allowed by this Court in the present matter on a limited basis to resolve the jurisdictional issue pertaining to this class of cases.

11.  *See* Act of Dec. 3, 2002, No.2002–142, P.L. 1147 (*inter alia*, adding 62 Pa.C.S. §§ 1721–1726, to replace the former Board of Claims Act) ("Act 2002–142").

12.  *Amici curiae*, the Pennsylvania Association of Non–Profit Homes for the Aging and the Pennsylvania Health Care Association, indicate that a number of the 300 claims involve multi-facility providers, each of which may contain individual challenges for thirty or more facilities, thus suggesting that our decision here may have at least an incrementally broader degree of impact.

■ Presently, Oakmont maintains that MA provider agreements are contracts and have been deemed by the courts to be such since the mid–1970s. *See, e.g., Ludlow Clinical Laboratories,* 22 Pa.Cmwlth. at 614, 350 A.2d at 208. Oakmont reasons that "but for" the MA provider agreements, caregivers would have no right to payment, and therefore, their rights clearly have a contractual dynamic; moreover, it contends, an action seeking payment for services rendered is classically contractual. Furthermore, Oakmont advances Judge Leavitt's position that an action does not cease to sound in contract merely because it involves the application of incorporated statutory prescriptions and/or administrative regulations to determine the contractual entitlements. *Accord Caritas Services, Inc. v. Department of Social & Health Services,* 123 Wash.2d 391, 869 P.2d 28, 36 (1994) ("A contractual right to specific reimbursement is not different from a statutory right to specific reimbursement if the statute is incorporated by reference into the contract."). Oakmont also contends that DPW's efforts to limit the extent to which the written documentation evidences the relationship cannot alter its fundamental character. Oakmont further cites to decisions of this Court that maintain a liberal construction of the Board of Claims Act, *see; e.g., Lowry v. Commonwealth,* 365 Pa. 474, 479, 76 A.2d 363, 366 (1950), and others that at least inferentially support its position in the MA arena,[13] as well as a myriad of federal and state court cases from other jurisdictions.[14] Oakmont also emphasizes DPW's original position

13. *See, e.g., Smock v. Commonwealth, DPW,* 496 Pa. 204, 208, 436 A.2d 615, 617 (1981) (plurality) (implicitly recognizing that claims for MA reimbursement asserted by a provider whose license to operate had been revoked were within the Board of Claims' jurisdiction); *Chester Extended Care Center v. DPW,* 526 Pa. 350, 354 n. 4, 586 A.2d 379, 381 n. 4 (1991) (describing the relationship between an MA provider and DPW as contractual); *Commonwealth, DPW v. Eisenberg,* 499 Pa. 530, 534, n. 7, 454 A.2d 513, 515 n. 7 (1982) (same).

14. *See, e.g., Barnes v. Gorman,* 536 U.S. 181, 186, 122 S.Ct. at 2100–2101 (2002) (describing conferral of government funds under Spending Clause legislation such as MA as " 'much in the nature of a contract' " (citation omitted; emphasis deleted)); *Green v. Cashman,* 605 F.2d 945, 946 (6th Cir.1979) (characterizing a provider agreement as a contract for purposes of determining provider rights); *Briarcliff Haven, Inc. v.*

that jurisdiction lay in the Board of Claims, which, again, it views as the effective position of the Commonwealth Court prior to the 2002 *River Street* decision.

As to *River Street*, Oakmont offers an extensive critique, challenging, in particular, the validity of the attempt to distinguish the *Divine Providence* line of cases, since in those cases the question of whether DPW breached the provider agreement by failing to follow its regulations was also presented; *Divine Providence* expressly held that this inquiry was subject to the Board of Claims' jurisdiction, *see Divine Providence*, 101 Pa.Cmwlth. at 252, 516 A.2d at 84; the Commonwealth Court repeatedly refused to overrule *Divine Providence*, *see supra* note 7; and the court also declined to overrule it in *River Street*. With regard to the Commonwealth Court's citations to this Court's opinions, Oakmont notes that none of the seminal decisions regarding Board of Claims jurisdiction, including *Yurgosky, Shovel Transfer*, and the *Delaware River Port Authority* line of cases cited therein,[15] involved straightforward claims for payment for services rendered.

Oakmont recognizes several factors tending to countervail its arguments, including federal regulations that require the

*Department of Human Resources*, 403 F.Supp. 1355, 1358 (N.D.Ga. 1975) (explaining that a "provider agreement is best construed as business contract between the State and each provider by which their participation in the Georgia Medicaid program is defined"); *Caritas Services*, 869 P.2d at 36 (holding that MA providers have claims arising from unilateral contracts with the state Medicaid agency); *Multicare Med. Center v. Department of Social & Health Services*, 114 Wash.2d 572, 790 P.2d 124, 133 (1990) (same); *Ohio Hosp. Ass'n v. Ohio Dep't of Human Services*, 62 Ohio St.3d 97, 579 N.E.2d 695, 700 (Ohio 1991) (finding jurisdiction over MA provider reimbursement claims to be within the jurisdiction of the state analogue to the Board of Claims, as contractual matters were in issue); *Indiana State Dep't of Health v. Legacy Healthcare, Inc.*, 752 N.E.2d 185, 186 (Ind.App.2001) (treating provider agreements as contracts); *cf. In re University Med. Center*, 973 F.2d 1065, 1075–79 (3d Cir.1992) (treating Medicare provider agreements as executory contracts for purposes of federal bankruptcy law); *United States v. Upper Valley Clinic Hosp., Inc.*, 615 F.2d 302, 306 (5th Cir.1980) (observing that an action to recover overpayments to a Medicare provider "sounds in contract").

**15.** *See Delaware River Port Auth. v. Thornburgh*, 508 Pa. 11, 493 A.2d 1351 (1985); *Delaware River Port Auth. v. Thornburgh*, 500 Pa. 629, 459 A.2d 717 (1983).

Department to maintain an appeals or exceptions process,[16] which DPW has maintained through its Bureau of Hearing Appeals. To account for this aspect of federal law, Oakmont has posited that the Bureau of Hearing Appeals' process and the Board of Claims forum should be regarded as a "dual-track system," with the forum selection option falling to MA providers. Oakmont further acknowledges the divestiture of Board of Claims jurisdiction over MA provider reimbursement claims that occurred in 2003, but contends that, by way of the same enactment, the General Assembly also expressly protected the Board's jurisdiction over previously-filed claims such as Oakmont's. In this regard, Oakmont highlights that the effective date of Act 2002–142 was delayed pending the Department's implementation of procedural protections relating to provider appeals. *See* Act 2002–142 § 22. According to Oakmont, if the Legislature had believed that providers had no rights in the Board of Claims, it would have disapproved all further litigation there immediately, particularly given *River Street*, which was final several months prior to the passage of Act 2002–142 (upon this Court's denial of the provider's request for allowance of appeal).

Finally, Oakmont asserts that principles of estoppel should be applied to foreclose DPW from altering its original position regarding the adjudication of provider rights in the Board of Claims, since fundamental injustice will result from a departure from the longstanding precedent of the Commonwealth Court confirming those rights. The *amici* supporting Oakmont's position also emphasize that the Board of Claims has traditionally and historically been available to providers for the litigation of MA payment disputes arising under a provider agreement and should be preserved for their pending claims.

The Department, for its part, maintains the position (which it has taken since at least the late 1980s) that MA provider reimbursement challenges are regulatory and not contractual

16. *See* 42 C.F.R. § 447.253(e) ("Provider Appeals. The Medicaid agency must provide an appeals or exceptions procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates.").

in character. DPW notes that provider agreements are not negotiated and contends that they represent nothing more than enrollment forms for a grant-in-aid program governed by statute and associated regulations, and over which the Board of Claims has no jurisdiction.[17]

To the degree that this Court would find that there is a contractual aspect to the parties' dispute, the Department observes that a contractual relationship alone is not sufficient to support Board jurisdiction. Rather, DPW argues that the source or basis of the rights involved must be determined, and, here, the status of Department regulations as the foundation of Oakmont's rights should be given controlling effect. Particularly in the context of a complex and highly-regulated federal-state program to administer aid to the medically needy, *see generally Lewis v. Grinker*, 965 F.2d 1206, 1216 (2d Cir.1992) (describing the federal Medicaid statute is one of the "most intricate ever drafted by Congress"), DPW contends that disputes over the meaning of involved regulations should be construed as regulatory in character regardless of any associated, contractual dynamic. *Cf. Hollander v. Brezenoff*, 787 F.2d 834, 838 (2d Cir.1986) (reasoning, in construing a special New York statute of limitations distinguishing between contract actions and actions involving statutory rights, that Congress, in specifying the requirement for provider agreements, did not intend to "create a contract cause of action for

**17.** In this regard, DPW notes the limited application that contract principles have in the grant setting, citing, for example, one federal court's observations in construing a federal grant to a hospital:

> [T]he relationship between the government and the hospitals here cannot be wholly captured by the term "contract" and the analysis traditionally associated with that term ... The "conditions" of this arrangement are not the result of a negotiated agreement between the parties but rather are provided by the statute under which the program is administered. Determination of statutory intent, therefore, is of more relevance to the interpretation of these conditions than is an inquiry into the intent of the two parties at the moment of the initial agreement. The contract analogy thus has only limited application.

*American Hosp. Ass'n v. Schweiker*, 721 F.2d 170, 182–83 (7th Cir. 1983). DPW also distinguishes the cases from other jurisdictions cited by Oakmont, on the basis that they did not expressly consider the argument that Medicaid is a grant-in-aid program.

the benefit of providers, but simply sought to facilitate the processing and transmission of information by providers supplying services under the Medicaid plan"); *United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1136–37 (E.D.Pa.1991) (determining that participation in the MA Program does not entail a contractual relationship). According to the Department, it is only by maintaining this essential frame of reference that disputes will be resolved in a setting and in a manner that will allow for the appropriate deference to be afforded to it, as the administrative agency charged with carrying out the relevant statutory scheme. *See generally Borough of Pottstown v. Pennsylvania Municipal Retirement Bd.,* 551 Pa. 605, 611, 712 A.2d 741, 744 (1998).

In this regard, DPW also notes the requirement of federal Medicaid regulations that the single state agency have sole authority to "[e]xercise administrative discretion in the administration or supervision of the [state Medicaid] plan," *see* 42 C.F.R. § 431.10(e)(1)(i); the Pennsylvania General Assembly's designation of the Secretary of Public Welfare as "the only person authorized to . . . interpret, or make specific the law administered by the department," *Pelton v. DPW,* 514 Pa. 323, 330, 523 A.2d 1104, 1107 (1987) (quoting 62 P.S. § 403(b)); the Department's charge to "maintain[ ] uniformity in the administration of public welfare . . . throughout the Commonwealth," 62 P.S. § 403(a); the federal requirement for the state agency charged with administering an MA program to provide an appeals or exceptions procedure covering provider reimbursement claims, *see supra* note 16; and the decision in *Kapil v. Association of Pennsylvania State College and University Faculties,* 504 Pa. 92, 470 A.2d 482 (1983), in which this Court recognized that, although collective bargaining agreements involving public employees are clearly contracts, the Legislature could not have intended to displace the Public Employee Relations Act relative to public labor disputes in its prescription for Board of Claims jurisdiction over contract disputes asserted against the Commonwealth. *See id.* at 101, 470 A.2d at 486. DPW contends that *Kapil* is equally applicable here— if the Department is "expected to develop a uniform system of

treatment throughout this Commonwealth ... [t]hese desirable ends would be completely frustrated were [the Court] to adopt the ... view that these matters fell within the jurisdiction of the Board of Arbitration of Claims." *Kapil*, 504 Pa. at 100–01, 470 A.2d at 486. Along these lines, DPW observes that the moratorium regulations in issue (a policy initiative intended to control the growth of publicly-funded institutional care services) apply to more than 660 nursing facilities operating in Pennsylvania, and thus, their importance is not limited to the present controversy.

As to the Commonwealth Court's line of decisions regarding MA provider reimbursement challenges, DPW offers a number of bases on which the older decisions can be distinguished from the present controversy and, to the degree that the effort to distinguish them fails, indicates that they should be overruled. In particular, DPW views *Divine Providence* as a dramatic departure from the plain terms of the Board of Claims Act, characterizing as a matter of form over substance the Commonwealth Court's effort to distinguish between adjudicating payment rates and resolving whether DPW's action in determining whether payment was due constituted a breach of the provider agreement. The Department contends that the Commonwealth Court largely righted this wrong with *River Street* in 2002, and in its present decision.

DPW also disagrees with Oakmont's position that the General Assembly protected Board of Claims jurisdiction over MA provider disputes in Act 2002–142; indeed, the Department characterizes as absurd the notion that the General Assembly intended to perpetuate a dual-track system of concurrent jurisdiction when it expressly denominated the Board's jurisdiction as exclusive. According to DPW, there is no evidence that the Legislature wished to confirm a position concerning the Board of Claims' jurisdiction that would circumvent the system that was designed to ensure the uniform administration of the multi-billion dollar MA Program.

The jurisdictional question before us is one of law, over which our review is plenary. *See MCI Worldcom, Inc. v.*

*Pennsylvania PUC,* 577 Pa. 294, 305 n. 3, 844 A.2d 1239, 1245 n. 3 (2004).

■ This matter has been extensively developed and well presented by both parties, and we acknowledge that both positions have some merit, particularly in the landscape of the relevant decisional law as it has developed over the years. Nevertheless, although we credit Oakmont's argument that an MA provider's relationship with DPW has contractual overtones, and we do not specifically adopt DPW's position that the MA Program represents a grant program at the agency-provider level,[18] we do accept the Department's core position, stemming from this Court's decision in *Kapil,* that the specter of a dual-track system for adjudicating provider rights would undermine the exclusive aspect of the Board of Claims' jurisdiction. *See Kapil,* 504 Pa. at 101, 470 A.2d at 486 ("Such an interpretation [allowing for dual-track litigation] would immediately create a conflict since the jurisdiction of the [Board] of Claims is expressly made exclusive.").[19] Particularly as the Board of Claims Act cannot be fully realized relative to MA provider reimbursement challenges (in light of the federal-law requirement for an agency appeals/exceptions process, *see supra* note 16), the litigation should fall to the agency arena

18. As Oakmont notes, the Public Welfare Code expressly characterizes payments to MA providers as reimbursement for services, *see, e.g.,* 62 P.S. §§ 443.6, 1406(a), 1407(a)(8), and since the Legislature itself has not utilized the grant terminology relative to MA reimbursement at the agency/provider level, we see no need to invoke it here. As both parties agree, however, there is no question that Medicaid is a grant-in-aid program at the federal/state level. *See, e.g., Bowen v. Massachusetts,* 487 U.S. 879, 898–900, 108 S.Ct. 2722, 2734–35, 101 L.Ed.2d 749 (1988); *Floyd v. Thompson,* 227 F.3d 1029, 1034 (7th Cir.2000); *Roe v. Ferguson,* 515 F.2d 279, 281 (6th Cir.1975).

19. As a linchpin of its analysis, the dissent indicates that the 2002 amendments do not create a dual track system for resolving claims. *See* Dissenting Opinion, *slip op.* at 4. We have not taken the position that they did, however, nor has either of the parties taken such a position. Rather, our point (which is in accordance with the arguments of both parties) is that if jurisdiction were to be recognized in the Board for pre-amendment cases, the necessary result would be a dual track system for such cases, since federal and state law requirements integral to the MA scheme directly undermine exclusivity of jurisdiction in the Board of Claims. This is why the reasoning of *Kapil,* which the dissent does not address, is relevant and persuasive here.

(and associated procedure for judicial review), in line with the reasoning of *Kapil*.[20] We reiterate, therefore, that the Board's exclusive jurisdiction over contractual claims asserted against the Commonwealth was not intended to vest that tribunal with jurisdiction over matters that are within the special competence and expressly prescribed authority of an executive agency.[21]

We also do not view Act 2002–142's prescription that pending claims are to be decided pursuant to the Board of Claims Act as protective of Board jurisdiction over Oakmont's claims. As the Department highlights, the jurisdictional provisions of the Board of Claims Act are as much a part of the statutory scheme as the provisions governing procedure. Thus, to the extent that those requirements are not met, the claims cannot be litigated before the Board in accordance with the enactment. That the General Assembly required a standing order

**20.** Oakmont distinguishes *Kapil* on the ground that, prior to Act 2002–142, the General Assembly did not expressly undertake to designate DPW as a tribunal for resolving provider reimbursement challenges. *See* Brief of Appellant at 24–25. Federal law, however, which is binding on Pennsylvania both under the Supremacy Clause of the United States Constitution, U.S. CONST art. VI, cl.2, and via the Commonwealth's choice to participate in the federal Medicaid program, expressly designates the state MA agency (*i.e.,* DPW) as such tribunal. *See supra* note 16. Accordingly, and for this purpose, we regard the federal regulation as the equivalent of a state statute. *See generally Kise v. Department of Military and Veterans Affairs,* 574 Pa. 528, 543–44, 832 A.2d 987, 996 (2003) (noting that federal regulations have the force of law for purposes of Supremacy Clause analysis).

**21.** Our present decision obviates the distinction that the Commonwealth Court appears to have been making between complex and simpler MA provider reimbursement claims. To the extent that a claim is within the broad scope of the federal regulation directing state agencies administering MA programs to maintain an appeals process, it falls under our decision here.

With respect to the parties' extensive citations to this Court's *Keenheel* and *Yurgosky* decisions, we find the cases relevant to the degree that they discuss general principles. They are materially distinct factually, however, such that their respective holdings are not particularly helpful to the analysis of the jurisdictional question as applied here. With respect to this Court's decisions in cases in which jurisdiction was asserted in the Board of Claims over MA provider claims, *see supra* note 5, we note the specific challenge raised by DPW here was not presented in those cases.

assuring that DPW maintains a procedure to govern agency appeals over prospective claims does not alter our analysis, since such a procedure was already in place for existing claims, per the federal regulation.

■ We do recognize that there are equities that favor Oakmont's position, particularly given *Divine Providence's* longstanding tenure as prevailing precedent, and in view of the prospect of Oakmont's claims now being returned to the agency setting for re-litigation after an already ten year course. These equities are offset, however, to some degree at least, by Oakmont's awareness of the Department's consistent position since the late 1980s, and the ready availability of a federally-prescribed, alternative forum with associated judicial review that would have alleviated the jurisdictional component of the conflict. Centrally, by maintaining the attempt to pursue these claims outside the administrative appeals process and in the forum of its own choice, Oakmont bore the risk that the Department's position concerning jurisdiction might ultimately prevail in the ensuing litigation. Additionally, and as such, we reject Oakmont's argument that DPW should be estopped in light of a general position that it abandoned nearly twenty years ago and prior to the time that Oakmont's claims had accrued and been asserted.

The order of the Commonwealth Court is affirmed.

Justice EAKIN files a dissenting opinion in which Mr. Justice BAER joins.

Justice EAKIN, dissenting.

I disagree with the majority that the reimbursement claims at issue here, filed under the Pennsylvania Medical Assistance Program prior to 2003, lie properly before DPW's Bureau of Hearing Appeals (BHA). Because I believe the Board of Claims has jurisdiction over these claims, I respectfully dissent.

As a service provider, Oakmont entered into a provider agreement with DPW. If Oakmont disputed the amount of reimbursement allowed by regulation, the BHA would be the

correct tribunal to hear that claim. *See DPW v. River Street Associates,* 798 A.2d 260, 264 (Pa.Cmwlth.2002) (dispute centers on meaning and interpretation of regulations, not whether DPW breached provider agreement by not following regulations); *Pa. Pharmacists Ass'n v. DPW,* 733 A.2d 666, 673 (Pa.Cmwlth.1999) (because issue involves technical question of interpretation and application of law, initial consideration by DPW is appropriate). But Oakmont does not dispute the amount of reimbursement allowed under the regulation. Instead, Oakmont asserts DPW improperly calculated the reimbursement under the contractual relationship between Oakmont and DPW. Although DPW characterizes the dispute as regulatory, not contractual, the facts do not bear out this view.

Oakmont does not question DPW's regulations on how to determine reimbursement. Instead, Oakmont's claim arises from DPW's application of regulations to the contract at issue. Oakmont argues it performed its obligations under the contract, but DPW underpaid for the services. In other words, Oakmont does not claim it is entitled to a higher rate or a different rate than the regulations provide, or that the underlying regulations are inadequate, but rather that it is entitled to more money under the regulations as they exist. As noted by the Commonwealth Court dissent, "Oakmont's claim sounds in contract. Although that contract incorporates by reference certain rate level regulations of DPW, the contract is the source of Oakmont's rights." *DPW v. Presbyterian Med. Center of Oakmont,* 826 A.2d 34, 41 (Pa.Cmwlth.2003) (Leavitt, J., dissenting).

Until 2002, Pennsylvania courts have consistently applied contract law to similar claims and held that the Board is the proper body to resolve them. In *DPW v. Divine Providence Hosp.,* 101 Pa.Cmwlth. 248, 516 A.2d 82 (1986), the court determined the Board had jurisdiction over a case which it determined "[did] not involve a question of eligibility or provider breach, but concerns the question of whether DPW breached the provider agreement by not following its own regulations." *Id.,* at 84. In *DPW v. Shapiro,* 91 Pa.Cmwlth. 64, 496 A.2d 887 (1985), the court determined the Board had

jurisdiction over a reimbursement dispute between DPW and a doctor. There was no question the doctor had performed services which were reimbursable; DPW denied payment because it claimed it had not received invoices from the doctor, in violation of DPW regulations. Although DPW regulations were discussed in order to resolve the dispute, the issue was the application of the regulations to the terms of the provider agreement. *Id.*, at 890.

In *Divine Providence, Shapiro*, and numerous other cases dating back several decades, DPW asserted BHA was the tribunal with original jurisdiction over provider claims. This position was unavailing until 2002, when the Commonwealth Court agreed in *River Street*. There, 16 nursing home facilities filed a class action, asserting DPW "violated, misinterpreted or misapplied regulations that govern the computation of certain Medicaid reimbursement rates." *River Street*, at 261. The majority here observes that *River Street* "appeared to draw a distinction based on the complexity of the provider's claim." Majority Opinion, at 423. The complexity of the claim itself, however, was not the reason the Commonwealth Court sent the claim in *River Street* to BHA. That court distinguished *River Street* from *Divine Providence*, stating, "*the dispute centers on the meaning and interpretation of regulations not whether DPW breached the provider agreement by not following its regulations.* At issue is a complicated method of establishing payment rates and setting payment rates. This is within the specific expertise and delegated legislative authority of DPW." *River Street*, at 264 (emphasis added).

Oakmont does not contest the regulations governing the overall reimbursement rates, but the computation itself. This is the very difference between a regulatory dispute, as in *River Street*, and a contractual dispute, as in *Divine Providence*. In *Shapiro*, the Commonwealth Court characterized the dispute, stating, "DPW contend[s] ... that it does not owe Claimant the money he claims is due." *Shapiro*, at 890. Here, DPW contends it does not owe the money Oakmont claims is due.

In 2002, the General Assembly reconstituted the Board and divested it of all *prospective* claims under the Medical Assistance provider agreements. *See* Act of Dec. 3, 2002, No.2002–142, P.L. 1147. This legislation resulted in BHA being vested with original jurisdiction over all future disputes arising under provider agreements. The Act directed all pending claims "shall be disposed of in accordance with the Board of Claims Act." Act 2002–142 § 21.2. It is possible the General Assembly intended this to mean BHA should settle all claims in accordance with the Act, but this tortured interpretation defies common sense; the Board is in a better position than BHA to settle claims in accordance with the Act.

This does not create a "dual track" system for resolving claims, as suggested by Oakmont and discussed in the majority opinion. It maintains the *status quo* for pending claims, *i.e.,* jurisdiction is maintained by the Board on any claims arising before the Act's effective date. As noted in the Commonwealth Court dissent, the Board has been deciding claims such as those at issue here for decades; clearly it has the expertise to decide the 20 remaining claims filed before Act 2002–142 removed the Board's jurisdiction.

Practicality might suggest BHA could handle all claims, both prospective claims and those filed before 2003, but the legislature declined to make it so, and "the jurisdiction of the courts is determined by the General Assembly." *Stackhouse v. Pa. State Police,* 574 Pa. 558, 832 A.2d 1004, 1012 (2003) (Eakin, J., dissenting). The General Assembly appropriately exercised its power when it reconstituted the Board. We must not reach beyond the legislation to confer jurisdiction to BHA, when the General Assembly could have, but did not, enact this legislation retroactively.

For the reasons stated above, I respectfully dissent.

Justice BAER joins this dissenting opinion.