**MAZZITTI AND SULLIVAN COUNSELING SERVICES, INC., Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs April 23, 2010.
Decided Oct. 7, 2010.
Reargument Denied Dec. 7, 2010.

Jeni S. Pilgrim, Harrisburg, for petitioner.

Sherri Glantz Patchen, Sr. Asst. Counsel, Harrisburg, for respondent.

BEFORE: COHN JUBELIRER, Judge, and McCULLOUGH, Judge, and KELLEY, Senior Judge.

OPINION BY Senior Judge KELLEY.

Mazzitti and Sullivan Counseling Services, Inc. (Mazzitti) petitions for review of a Final Order issued by the Secretary of the Department of Public Welfare (DPW). The Secretary's order upheld an order of the DPW's Bureau of Hearings and Appeals (BHA), which had adopted the Recommendation of a DPW Administrative Law Judge (ALJ) dismissing Mazzitti's claim for payment under the Pennsylvania Medical Assistance (MA) Program for outpatient mental health services that it had provided to children under 21 years of age. We affirm.

Mazzitti was established in 1983 offering outpatient drug and alcohol addiction treatment programs. Mazzitti has maintained its drug and alcohol treatment license with the Commonwealth since 1983.

In 1994, DPW added outpatient mental health services to children under 21 years of age such as Mobile Therapy (MT), Behavior Special Consultant (BSC), and Therapeutic Staff Support (TSS), also known as "wraparound services", to its fee schedule.[1] All enrolled providers in the

---

1. As the United States Supreme Court has noted:

Medicaid is a cooperative federal-state program that provides federal funding for state medical services to the poor. See

*Wilder v. Virginia Hospital Assn.*, 496 U.S. 498, 502 [110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) ]. State participation is voluntary; but once a State elects to join the program, it must administer a state plan that meets federal requirements. One requirement is that every participating state must have an Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) program. See 79 Stat. 343, as amended, 42 U.S.C. §§ 1396a(a)(43), 1396d(r). EPSDT programs provide health care services to children to reduce lifelong vulnerability to illness or disease. The EPSDT provisions of the Medicaid statute require participating States to provide various medical services to eligible children, and to provide notice of the services. See *ibid.*

*Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433–434, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004).

In addition, with respect to the provision of outpatient mental health services, the First Circuit Court of Appeals has noted:

Congress created the Medicaid program, 42 U.S.C. §§ 1396–1396v, in 1965. Over time, it augmented the program's coverage to provide [EPSDT] services to Medicaid-eligible children. See *id.* §§ 1396a(a)(10), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r)(5). Congress intended that these revisions would give children access to preventative health care (e.g., vision, hearing, and dental services), preempt the onset of childhood illness, and identify children with disabilities in need of early attention. See, e.g., H.R.Rep. No. 101–247, at §§ 395–401 (1989), *reprinted in* 1989 U.S.C.C.A.N. 2834, 2869–2871. The EPSDT reforms enacted by Congress in 1989 (as part of the Omnibus Budge Reconciliation Act of 1989, Pub.L. No. 101–239, 103 Stat. 2106)[, (OBRA '89),] were particularly noteworthy in two pertinent respects. First, Congress obligated participating states to provide a comprehensive package of preventative services that met reasonable standards of medical necessity. 42 U.S.C. § 1396a(a)(43), 1396d(r). Second, Congress expanded EPSDT services to include "[s]uch other necessary health care, diagnostic services, treatment and other measures described [as medical assistance] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." *Id.* § 1396d(r)(5). In effect, these amendments required states to provide Medicaid cover-

age for any service "identified as medically necessary through the EPSDT program." 135 Cong. Rec. S6899, 6900 (daily ed. June 19, 1989) (statement of Sen. Chafee).

*Rosie D., by her parents John and Debra D., et al. v. Swift*, 310 F.3d 230, 232 (1st Cir.2002).

As the Pennsylvania Supreme Court has noted:

Pennsylvania's [MA] Program, which is designed to provide medical assistance to certain individuals who cannot afford to pay for necessary medical services, was created pursuant to provisions in the Public Welfare Code (the "Code"), [Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §§ 441.1–449,] and in accordance with the requirements of the federal Medicaid Act, 42 U.S.C. § 1396 *et seq.* The Code vests DPW with responsibility for administration of the program, *see* 62 P.S. § 403, and for "establish[ing] rules, regulations and standards . . . as to eligibility for assistance and as to its nature and extent." *Id.* at § 403(b). . . .

*Department of Public Welfare v. Devereux Hospital Texas Treatment Network*, 579 Pa. 313, 320, 855 A.2d 842, 846 (2004) (footnote omitted).

In light of the foregoing, on September 8, 1995, DPW issued MA Bulletin Number 1153–95–01 which provided, in pertinent part:

In 1989, Congress amended the [EPSDT] provisions of the federal Medicaid statute to require states to provide "necessary health care, diagnostic services, treatment, and other measures described in [the statute] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, *whether or not such services are covered under the State plan.*" 42 U.S.C. § 1396d(r)(5) ("OBRA '89") (emphasis added).

Therefore, individuals under age 21 with emotional disturbances or mental illnesses may be eligible for a wide range of mental health services to assist families to care for their children and adolescents at home and in their communities as alternatives to the more restrictive residential and psychiatric inpatient services.

Consistent with the OBRA '89 requirements, the Office of Medical Assistance Programs (OMAP) is issuing the following guidelines, whereby medically necessary outpatient wraparound mental health services or health-related services are eligible for [MA] reimbursement, when provided to

MA program are given a provider type number. Only a qualified and enrolled Provider Type 50, and certain enrolled psychiatrists, licensed psychologists, and

eligible individuals, whether or not those services are listed in the [MA] Program Fee Schedule or otherwise covered in the State Medicaid Plan, as long as the services are authorized under the federal Medicaid statute. These guidelines apply both to services not on the fee schedule and to traditional "amount, duration, and scope" limits as set forth in the State Medicaid Plan.

\* \* \*

To receive MA reimbursement for these outpatient wraparound mental health services, a provider must:
1. Be licensed by OMH to provide mental health services. . . .
2. Be currently enrolled as an MA provider.
An entity that provides licensed outpatient mental health services, partial hospitalization services or family-based mental health services may enroll as a Provider Type 50 by completing an enrollment form and receiving a[n MA] provider number. . . .
3. Provide services consistent with the [Child and Adolescent Service System Program (CASSP)] Principles for Children's Services in Pennsylvania and the prescribed treatment goals, intervention approaches and expected outcomes for the child or adolescent.

Reproduced Record (RR) at 1046, 1048–1049.

2. Section 1241.1 of DPW's regulations provides:

The MA Program provides payment for EPSDT services rendered to eligible recipients by practitioners enrolled as providers under the program. Payment for EPSDT services is subject to this chapter, Chapter 1101 (relating to the general provisions) and the limitations established in Chapter 1150 (relating to MA Program payment policies) and the MA Program fee schedule.

55 Pa.Code § 1241.1.

Section 1101.21 of DPW's regulations defines "provider", in pertinent part, as "[a]n individual or medical facility which signs an agreement with [DPW] to participate in the MA program, including, but not limited to: licensed practitioners, pharmacies, hospitals,

the like, could submit claims for payment to DPW for the provision of wraparound services.[2] However, a qualified and enrolled Provider Type 50 could subcontract for the provision of wraparound services.[3]

nursing homes, clinics, home health agencies and medical purveyors." 55 Pa.Code § 1101.21. *See also* Section 1401 of the Code, *added by* the Act of July 10, 1980, P.L. 493, *as amended*, 62 P.S. § 1401 ("'**Provider**' means any individual or medical facility which signs an agreement with the [DPW] to participate in the [MA] program, including, but not limited to, licensed practitioners, pharmacies, hospitals, nursing homes, clinics, home health agencies and medical purveyors.").

In turn, Section 1150.51 of DPW's regulations provides, in pertinent part:

(a) Payment will be made to providers. Payment may be made to practitioners' professional corporations or partnerships if the professional corporation or partnership is composed of like practitioners. Payment will be made directly to practitioners if they are members of professional corporations or partnerships composed of unlike practitioners. . . . Payment will be made for medical services or items covered by the program, furnished by enrolled providers subject to the conditions and limitations established in this chapter, Chapter 1101 (relating to general provisions) and the specific chapters for each provider type. . . .

55 Pa.Code § 1150.51(a). *See also* MA Bulletin Number 1153–95–01 ("To receive MA reimbursement for these outpatient wraparound mental health services, a provider must: 1. Be licensed by OMH to provide mental health services. . . . 2. Be currently enrolled as an MA provider. . . . 3. Provide services consistent with the CASSP Principles for Children's Services in Pennsylvania and the prescribed treatment goals, intervention approaches and expected outcomes for the child or adolescent.") RR at 1048–1049.

3. MA Bulletin Number 1153–95–01 specifically provided:

[A] Provider Type 50 may provide the service directly, either on or off site, or may subcontract for mental health services for a child when the agency does not provide the medically necessary service, *so long as the subcontracted service is prior approved by*

In 1996, Mazzitti began working as a subcontractor with Meadows Psychiatric Clinic (Meadows), a qualified and enrolled Provider Type 50, for the provision of wraparound services. The agreement between Mazzitti and Meadows provided that Meadows would train Mazzitti's staff and supervisor and monitor their work, and pay Mazzitti 75% of what DPW paid to Meadows for its provision of wraparound services. However, a number of billing issues arose between Mazzitti and Meadows.

In 1997, Mazzitti's employee in charge of record-keeping resigned. As a result, Mazzitti hired Mona Olvera as a case manager. In addition, Olvera was the principal for Healthy Options, Inc. (Healthy Options). Olvera approached Mazzitti about working with her and Healthy Options for the provision and billing for wraparound services. Although Olvera represented to Mazzitti that Healthy Options had a Provider Type 50 "license" with DPW, Healthy Options was not an enrolled Provider Type 50 approved for the provision of wraparound services; rather, it was only enrolled and approved by DPW for the provision of case management services. Mazzitti did not contact DPW to determine whether Healthy Options could seek reimbursement from DPW as an enrolled Type 50 provider for wraparound services.

Ultimately, on January 2, 1998, Mazzitti and Olvera entered into a subcontract agreement under which Mazzitti would provide wraparound services and Healthy Options would submit the billing to DPW for the services. Under the agreement, Mazzitti agreed to abide by DPW's rules and regulations, and Healthy Options agreed to pay Mazzitti 90% of what DPW paid to Healthy Options. Because Healthy Options had no billing department or staff, Mazzitti did the data entry and billing to DPW, and kept the billing records for Healthy Options, using software supplied by Olvera. Olvera instructed Mazzitti to use Healthy Options' Type 50 provider MA identification number (MAID) and group enrollment number when submitting the billing to DPW. Healthy Option and Mazzitti agreed that all checks and remittance advices received from DPW would be sent to Mazzitti.

In February of 1998, service descriptions were submitted to DPW under Healthy Options' name for MT and TSS services provided by Mazzitti. DPW's Office of Mental Health and Substance Abuse Services (OMHSAS) denied the service descriptions because Healthy Options was not a licensed mental health provider and did not qualify to provide wraparound services.

In April of 1998, service descriptions were submitted to DPW for MT and TSS services under the name of Ivonne Acrich, M.D., a psychiatrist employed by Mazzitti. OMHSAS approved these service descriptions.

In 1998 and 1999, additional service descriptions were submitted to DPW for MT, TSS and BSC services under the names of five psychologists who worked for Mazzitti, including John Ramos. These service descriptions were approved by OMHSAS.

On June 2, 1998, Olvera called DPW's Bureau of Quality Management and Program Integrity (BPI) to inquire into why claims for payment were being denied. During the course of the telephone call,

*the Department (see Attachment 4—Example Subcontract Agreement Form).* The enrolled provider may subcontract with the individual or an agency not enrolled as an MA provider. Responsibility for the clinical direction of the subcontracted services, and for the qualifications of the subcontracted provider of the service, rests with the enrolled service provider.
RR at 1049 (emphasis added).

BPI became aware that Healthy Options was submitting claims under its MAID for unauthorized wraparound services. On June 5, 1998, BPI sent a letter to Healthy Options advising that it was improper for Healthy Options to submit billing for wraparound services, that Healthy Options must cease such billing, and that BPI was going to initiate a review of Healthy Options' billing to DPW.

After the June 5, 1998 letter, claims for wraparound services were no longer submitted to DPW under Healthy Options' MAID number. Rather, Olvera instructed Mazzitti to use Dr. Acrich's MAID number as Dr. Acrich was an authorized provider of wraparound services. In addition, Olvera instructed Mazzitti to resubmit certain denied TSS service claims using Dr. Acrich's MAID number, and to resubmit certain denied BSC service claims using Mr. Ramos's MAID number.

However, Dr. Acrich did not provide wraparound services, did not supervise the wraparound program, and did not provide clinical oversight of the wraparound program. Moreover, Mazzitti resubmitted these claims to DPW using Dr. Acrich's MAID number knowing that Dr. Acrich did not provide MT, BSC, or TSS wraparound services.

BPI initiated a review to determine if Healthy Options would be required to reimburse DPW for its prior improper billing for wraparound services. BPI also reviewed Meadows' and Dr. Acrich's billing histories because they had submitted claims for recipients for whom Healthy Option's MAID number had been used to submit claims. By letter dated December 14, 1998, DPW notified Healthy Options that Dr. Acrich could only bill for services described and rendered in the service descriptions submitted to OMHSAS, and not for services provided by Healthy Options.

By letters dated January 5, 1999, BPI requested medical records and other documents from Healthy Options, Olvera, Dr. Acrich, and Meadows, and a number of documents were submitted in response to the request. In addition, although Mazzitti knew that Healthy Options was being audited, Mazzitti did not seek an explanation of the nature of the audit from Olvera. Moreover, Mazzitti did not contact DPW regarding the Healthy Options audit. Finally, during this time, the relationship between Mazzitti and Olvera began to deteriorate, and Olvera had an altercation with one of Mazzitti's partners.

In February of 1999, Dr. Acrich received an IRS Form 1099 for wraparound service fees that had been paid by DPW to her, but that she had never received. In addition, checks and bills started coming to Mazzitti from DPW with Dr. Acrich's and Healthy Options' names on them. Although Mazzitti held onto the checks, Mazzitti did not contact DPW regarding the checks assuming that it was a problem that Olvera had to work out with DPW.

By letter dated May 3, 1999, Mazzitti gave Healthy Options a 30–day notice that it was terminating their contract. On May 5, 1999, Mazzitti notified Olvera that she was not to conduct any Healthy Options business at its facilities. Mazzitti continued to accept new MA recipients and to provide wraparound services even though it had severed its ties with Healthy Options, and knew that it did not have a license and could not bill DPW for these services. In addition, even though Mazzitti was aware that Dr. Acrich was not providing wraparound services, it continued to use Dr. Acrich's MAID number to submit claims for payment to DPW in June of 1999 for services that it had provided in May of 1999.

On May 27, 1999, BPI was notified by the Medicaid Fraud Unit of the Attorney

General's Office that it had initiated a criminal investigation into the matter and that BPI had to cease its investigation. Mazzitti became aware of the criminal investigation in early June of 1999. Mazzitti continued to provide wraparound services even after it became aware of the criminal investigation. Mazzitti was hoping that it could enter into another subcontracting arrangement with another enrolled Type 50 provider and that it would be able to submit claims for these wraparound services.

In June of 1999, officials from the Medicaid Fraud Unit and BPI interviewed Dr. Acrich. Dr. Acrich stated that her MAID number had been used for billing purposes, unbeknownst to her, for wraparound services that she had not provided or supervised.

In December of 1999, Olvera committed suicide. As a result, BPI ended its review of Healthy Options, and determined to not seek reimbursement from her estate for MA payments that had been made.

Up to March of 1999, after which Mazzitti began holding the checks sent by DPW, Healthy Options paid Mazzitti 90% of the amount that DPW had paid for wraparound services that were improperly billed and that had not been provided by an enrolled provider. In total, approximately $203,449.00 was paid by DPW for claims submitted under Dr. Acrich's MAID number, and $61,862.75 was paid by DPW for claims submitted under Healthy Options' Type 50 provider MAID number. Mazzitti did not reimburse DPW for any of the money paid by Healthy Options.

On July 30, 2001, Mazzitti initiated the instant action in the Board of Claims (Board). In this case, Mazzitti is seeking the payment of $121,090.00 from DPW, comprised of a payment totaling $99,661.00 for the checks that were sent by DPW but that were held by Mazzitti, and a payment totaling $21,429.00 for wraparound services that it had provided after it had terminated its agreement with Healthy Options. In the complaint filed with the Board, Mazzitti sought payment from DPW in the foregoing amounts under the alternate equitable theories of quantum meruit, unjust enrichment and equitable estoppel.

In May of 2005, a hearing was conducted before the Board. However, on February 6, 2006, the Board transferred the matter to DPW's BHA in accordance with the Pennsylvania Supreme Court's decision in *Department of Public Welfare v. Presbyterian Medical Center of Oakmont*, 583 Pa. 336, 877 A.2d 419 (2005).[4]

4. In *Presbyterian Medical Center of Oakmont*, the Pennsylvania Supreme Court determined that the BHA, and not the Board of Claims, possessed jurisdiction over a nursing facility's claim for reimbursement under the MA program. *See Id.*, 583 Pa. at 352–353, 877 A.2d at 429–430 ("[A]lthough we credit Oakmont's argument that an MA provider's relationship with DPW has contractual overtones, we do not specifically adopt DPW's position that the MA Program represents a grant program at the agency-provider level, we do accept the Department's core position, stemming from this Court's decision in *Kapil* [*v. Association of Pennsylvania State College and University Faculties*, 504 Pa. 92, 470 A.2d 482 (1983)], that the specter of a dual-track system for adjudicating provider rights would undermine the exclusive aspect of the Board of Claims' jurisdiction. *See Kapil*, 504 Pa. at 101, 470 A.2d at 486 ('Such an interpretation [allowing for dual-track litigation] would immediately create a conflict since the jurisdiction of the [Board] of Claims is expressly made exclusive.'). Particularly as the Board of Claims Act[, Act of May 20, 1937, P.L. 728, *as amended and reenacted*, 72 P.S. §§ 4651-1–4651-10, *repealed by* Act of December 3, 2002, P.L. 1147,] cannot be fully realized relative to MA provider reimbursement challenges (in light of the federal-law requirement for an agency appeals/exceptions process[ ]), the litigation should fall to the agency arena (and associated procedure for judicial review), in line with the reasoning of *Kapil*. We

On July 10, 2007, the parties agreed to submit the matter to the BHA based upon the record created before the Board. On January 23, 2009, the ALJ issued a Recommendation that Mazzitti's claim for payment be denied. On January 30, 2009, the BHA issued an order adopting the ALJ's Recommendation. On February 27, 2009, the Secretary issued an order granting Mazzitti's motion for reconsideration. However, on August 14, 2009, the Secretary issued a Final Order upholding the BHA's order adopting the ALJ's Recommendation denying Mazzitti's claim for payment. Mazzitti then filed the instant appeal.[5]

In this appeal, Mazzitti claims[6] that the Secretary erred in upholding the BHA's order because: (1) BHA erred in determining that it is not entitled to payment under the alternate equitable theories of quantum meruit, unjust enrichment and equitable estoppel; and (2) BHA's determination that it is not entitled to payment under the alternate equitable theories of quantum meruit, unjust enrichment and equitable estoppel is not supported by substantial evidence.

Mazzitti first claims that the Secretary erred in upholding the BHA's order because BHA erred in determining that it is not entitled to payment under the alternate equitable theories of quantum meruit, unjust enrichment and equitable estoppel. We do not agree.

It is well settled that "[a] court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. The doctrine of unclean hands[7] requires that one seeking equity act fairly and without fraud or deceit as to the controversy in issue...." *Terraciano v. Department of Transportation*, 562 Pa. 60, 69, 753 A.2d 233, 237–238 (2000) (citations omitted). As the Pennsylvania Supreme Court has noted:

> [T]he doctrine of unclean hands is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the

---

reiterate, therefore, that the Board's exclusive jurisdiction over contractual claims asserted against the Commonwealth was not intended to vest that tribunal with jurisdiction over matters that are within the special competence and expressly prescribed authority of an executive agency.") (footnotes omitted).

5.  In reviewing a DPW decision to deny reimbursement under the MA program, this Court's scope of review is limited to determining whether any constitutional rights were violated, whether there was an error of law, or whether essential findings of fact are supported by substantial evidence. *Devereux Hospital Texas Treatment Network.* "Substantial evidence" is evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion. *Gray v. Department of Public*

*Welfare*, 903 A.2d 647 (Pa.Cmwlth.2006). In addition, it is within the discretion of the factfinder to make credibility determinations and these determinations will not be disturbed on appeal. *Id.*

6.  In the interest of clarity, we consolidate the claims raised by Mazzitti in this appeal.

7.  It is well settled that this Court may affirm the Secretary's Final Order where the result is correct, even if the rationale for the decision was erroneous, so long as the correct basis for the decision is apparent on the record. *Maras v. Department of Public Welfare*, 111 Pa.Cmwlth. 404, 534 A.2d 153 (1987). It is equally well settled that this Court may *sua sponte* raise the doctrine of unclean hands. *In re Estate of Pedrick*, 505 Pa. 530, 482 A.2d 215 (1984).

historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith.... Thus while 'equity does not demand that its suitors shall have led blameless lives' ... as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue....

*Shapiro v. Shapiro*, 415 Pa. 503, 506–507, 204 A.2d 266, 268 (1964) quoting *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814–15 [65 S.Ct. 993, 89 L.Ed. 1381 (1945) ].

*Jacobs v. Halloran*, 551 Pa. 350, 359–360, 710 A.2d 1098, 1103 (1998).

As noted above, it was found as fact in this case that Mazzitti submitted claims to DPW for reimbursement using Dr. Acrich's MAID number for wraparound services, and resubmitted denied claims under her MAID number for wraparound services, knowing that she did not provide wraparound services. These findings are amply supported by the certified record in this case.[8]

8. More specifically, Mazzitti's president testified, in pertinent part, as follows:

Q. Let's go through a process of how the billing process would start from the time that the service was performed by one of your employees. What would happen after the service was performed?
A. After the service was performed it was the employees' jobs to make sure that they had their billing slips filled out with the correct time, with the name of the child that they were working with, and with the correct date that the services were provided.

And each one of those services then had to be initialed and signed by the child's parent, indicating that they had indeed been there and worked with that child on that day during that time.

Once those slips were completed, they also had to write progress notes that matched the service delivery that was provided.

Once the progress notes were written and the billing slips matched, they were given to [Olvera], who was the case manager; she made sure that everything was according to what was required so that they could be billed for services.

And then she would take all of the billing slips for the week and compile them and write down all of the things necessary for the data entry, and then I would take it home to my wife, who would do the data entry.
Q. Now, your wife was an employee of [Mazzitti]?
A. Yes.

Q. And you had some sort of remote terminal or something at home that could do that?
A. Yes. Well, we had a computer with a dial-up back in 1998. My wife worked from home. She worked as our bookkeeper for ten years.
Q. This contract started in January of '98, at least the signed contract?
A. Uh-huh.
Q. Did at some point your wife become ill?
A. Yes, March 1.
Q. Of?
A. of '98. My wife was diagnosed with pancreatic cancer.
Q. And would she continue to do this work?
A. Yes. As much as she could.
Q. And if your wife couldn't do the work, who would do it?
A. Then I would do the data entry. It was not a complicated process.

\*　　\*　　\*

Q. Would you then be responsible for keeping those records, the billing records?
A. I think that we kept copies of the slips, all of the slips, so that you could reference back to them. When [Olvera] would get the remittance advice, she could go and say, well, this service was denied, and she could go back and check the slip and say, well, this needs to be rebilled, or this has been denied, it's legitimate, whatever. So we could keep the copies.
Q. And you kept them in the ordinary course of your business?

A. Yes.

\* \* \*

Q. What about Dr. Acrich? How did she get hired?

A She was interviewed by Andy Sullivan, and then hired.

Q. What was she hired for?

A. Provide psychiatric services.

Q. Anything else?

A. I think that was the crux of it initially.

Q. Was she also doing med checks?

A. Isn't that part of psychiatric services?

Q. Okay, I'm sorry. You said psychiatric services?

A. Yes.

Q. What else do you consider psychiatric services?

A. Evaluations, counseling.

Q. What kind of counseling?

A. Individual, family.

Q. So you said Andy Sullivan met with her or hired her?

A. Both.

Q. You were not involved in that?

A. I'm sure she was introduced to me before she was hired.

Q. Her only involvement with the wraparound program was the performance of evaluations; is that correct? And med checks if you consider—

A. Yes.

Q. Okay. But she had no involvement with the MT's or the BSC's or the TSS's?

A. Unless [Olvera] told her that she needed to have some involvement. I guess that's true.

\* \* \*

Q. Okay. You said at some point [Olvera] told you that the numbers had to be changed, the provider number that was being used had to be changed.

A. Yes.

Q. So do you know what number was being used originally?

A. Offhand I don't remember. Whatever number she gave us to use originally.

(Document handed to witness.)

Q. Is this what she gave you when the number switched to Dr. Acrich's number?

(Witness perusing document.)

A. I don't know that she gave me this sheet. Probably.

Q. Well, this was in your files. And I think you identified the second page of it as [Olvera]'s handwriting,—

A. Yes.

Q. —I guess, with your wife's name on top with the home fax number.

A. Right.

Q. And this shows it's dated 6/10/98.

A. Uh-huh.

Q. There's an arrow there. What does that mean to you?

A. That the services listed underneath there need to be billed on that number.

Q. And that number being—

A. Dr. Acrich's.

\* \* \*

Q. Was this list given to you in the fall of '98?

A. It was given to me. I don't know exactly when.

Q. You said that [Olvera] told you to use the new group enrollment number for the TSS, MT and BSC?

A. Yes.

Q. The group enrollment number is the same number as the number listed next to Dr. Acrich.

A. Yes.

Q. You see that?

A. Now.

Q. And you also see the Healthy Options number is different than this group enrollment number? This isn't something that you noticed back then?

A. Well, yes.

\* \* \*

Q. Now, at some point you started holding checks. That was in March [of 1999]?

A. Yes.

Q. And that's when you noticed—well, you would notice the checks were payable to her earlier than that, hadn't you?

A. I had not consciously taken a look at the payee.

Q. So Dr. Acrich came to you with the 1099 issue, and about that time you realized the checks were made payable to her.

A. Yes.

Q. You said, what's going on?

A. Yes.

Q. And you started to withhold the checks?

A. Yes.

\* \* \*

Q. Okay. When you submitted these claims, or, in your words, data entry, in June [of 1999], what provider number did you use?

A. Same numbers we had been using. The numbers [Olvera] directed us to use.

Q. Dr. Acrich's number?

A. As we now know it.

Moreover, this type of fraudulent billing is specifically prohibited by the Code. In particular, Section 1407(a)(7) of the Code states that "[i]t shall be unlawful for any person to ... [s]ubmit a claim which misrepresents ... the identity of the attending, prescribing or referring practitioner; or the identity of the actual provider." 62 P.S. § 1407(a)(7).[9]

Thus, Mazzitti's direct and complicit conduct in the execution of this fraudulent billing scheme, which directly relates to the payment for the provision of wraparound service that Mazzitti now seeks, compels the application of the doctrine of unclean hands and precludes the grant of such relief under the alternate equitable theories of quantum meruit, unjust enrichment and equitable estoppel. *See, e.g.*, *Jacobs*, 551 Pa. at 360, 710 A.2d at 1103–1104 ("Fyffe–McFadden's dishonesty regarding the identity of the driver of the vehicle constitutes bad faith which is directly relevant to the delay in prosecution from

Q. I want to show you what's [marked] as [DPW] Exhibit 65.

(Document handed to witness.)

Q. And in this letter the lawyer's talking about the utilization of various doctor provider numbers. That's on page one.

And then on the second page, additionally, as we discussed, there's a potentially outstanding debt to [DPW] for billings which were conducted improperly resulting in the return of a substantial amount of money.

So after receiving this letter—

A. Uh-huh. I laughed for a while.

Q. You laughed for a while, and then—

A. Absolutely.

Q. —you did more data entry using that same provider number?

A. We finished our obligations under the contract and billed to the end of the month.

Q. And continued to input claims—

A. And then we stopped.

Q. —to [DPW] using a provider number that—

A. Supplied by Healthy Options.

Q. That at this point, this letter is saying that it may have been improperly used?

A. Where does it say that?

Q. That was the second page. There's a potentially outstanding debt to [DPW] for billings which were conducted improperly.

And you were doing the billings; you say data entry?

A. That's correct.

Q. Resulting in the return of a substantial amount of money.

A. Not our issue.

Q. And you continued to input the data using the—

A. According to our contract.

Q. Whose number did you think you were using then?

A. [DPW] kept issuing checks made out to Healthy Options. I assumed it had to be hers.

Q. These are the checks that have Dr. Acrich's name on the first line?

A. And the Healthy Options on the second line.

Q. Right.

A. Right. Potato, po-tah-to.

RR at 23–24, 57–58, 62–63, 64, 68, 80–81.

9. *See also Department of Public Welfare v. Portnoy*, 129 Pa.Cmwlth. 469, 566 A.2d 336, 339 (1989), *aff'd*, 531 Pa. 320, 612 A.2d 1349 (1992) ("Article XIV of the Code, entitled 'Fraud and Abuse Control,' sets forth a detailed scheme of provider prohibited acts and recipient prohibited acts. Section 1407(a) of the Code, 62 P.S. § 1407(a), enumerates the various provider prohibited acts. Section 1407(b) states that a violation of any of the provisions of subsection (a), with the exception of subsection (a)(11), shall constitute a felony of the third degree, with a maximum penalty of a fine of fifteen thousand ($15,000) dollars and seven years imprisonment. 62 P.S. § 1407(b)(1). Section 1407(b) also provides that any person convicted under subsection (a) shall be ineligible to participate in the [MA] program for a period of five (5) years from the date of conviction. 62 P.S. § 1407(b)(3). Finally, section 1407(c)(1) of the Code, 62 P.S. § 1407(c)(1), provides that if DPW determines that a provider has committed any prohibited act or has failed to meet any requirement under subsection (a), DPW has the authority, upon notice to the provider, to terminate the provider agreement and to institute civil proceedings for twice the amount of excess benefits or payments plus legal interest from the date of the violation(s).") (footnote omitted).

which she seeks relief. To allow her to benefit from a delay in which she in part created is inequitable and will not be permitted.") (footnotes omitted).[10] As a result, the Secretary did not err in upholding the BHA's order because BHA did not err in determining that Mazzitti is not entitled to payment under the alternate equitable theories of quantum meruit, unjust enrichment and equitable estoppel, and Mazzitti's assertion to the contrary is patently without merit.

Finally, Mazzitti claims that the Secretary erred in upholding the BHA's order because BHA's determination that it is not entitled to payment under the alternate equitable theories of quantum meruit, unjust enrichment and equitable estoppel is not supported by substantial evidence. Again, we do not agree.

As noted above, it was found as fact in this case that Mazzitti submitted claims to DPW for reimbursement using Dr. Acrich's MAID number for wraparound services, and resubmitted denied claims under her MAID number for wraparound services, knowing that she did not provide wraparound services. In addition, as outlined above, these findings are amply supported by the certified record in this case. *See* RR at 23–24, 57–58, 62–63, 64, 68, 80–81.

■ We have previously noted that "substantial evidence" is evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion. *Gray.*

Also, it is within the discretion of the factfinder to make credibility determinations and these determinations will not be disturbed on appeal. *Id.*

As the factual determinations in this matter are supported by substantial evidence, they will not be disturbed by this Court in this appeal. *Gray.* In addition, these findings amply support the Secretary's Final Order upholding the BHA's determination that Mazzitti is not entitled to payment under the alternate equitable theories of quantum meruit, unjust enrichment and equitable estoppel. *See Jacobs.*

Accordingly, the Secretary's Final Order is affirmed.

Judge McCULLOUGH concurs in the result only.

### ORDER

AND NOW, this 7th day of October, 2010, the Final Order of the Secretary of the Department of Public Welfare, dated August 14, 2009 at No. 94–06–044M, is AFFIRMED.

10. *See also Heckler v. Community Health Services*, 467 U.S. 51, 63, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) ("Justice Holmes wrote: 'Men must turn square corners when they deal with the Government.' *Rock Island A. & L.R. Co. v. United States*, 254 U.S. 141, 143 [41 S.Ct. 55, 65 L.Ed. 188 (1920)]. This observation has its greatest force when a private party seeks to spend the Government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to the law.") (footnote omitted).