**FOUNDATIONS OF BEHAVIORAL HEALTH, Petitioner**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 17, 2013.

Decided Aug. 5, 2013.

John A. Kane, Harrisburg, for petitioner.

Peter J. Garcia, Senior Assistant Counsel, Harrisburg, for respondent.

BEFORE: SIMPSON, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge BROBSON.

Petitioner Foundations Behavioral Health (Foundations)[1] petitions for review of an order of the Department of Public Welfare (DPW), Bureau of Hearings and Appeals (BHA), dated April 13, 2012. BHA's order adopted an Administrative Law Judge's (ALJ) recommendation to deny Foundations' appeal from a determination by DPW's Bureau of Program Integrity (BPI). In its determination, BPI retrospectively denied reimbursement to Foundations for services Foundations rendered to S.D., a 13-year-old male patient, from June 11, 2010, through August 27, 2010,[2] in part, because Foundations failed

---

1. Although Petitioner's name appears as "Foundations of Behavioral Health" in the caption, the documents contained in the record indicate that Petitioner is actually named "Foundations Behavioral Health."

2. In its determination, BPI actually indicates that it was denying reimbursement from June 11, 2010, through August 25, 2010. (Reproduced Record (R.R.) at 70.) The ALJ, however, determined that DPW paid for S.D.'s stay at Foundations' inpatient psychiatric facility until August 27, 2010, which the ALJ deter-

to provide sufficient documentation demonstrating that S.D.'s continued stay in acute short-term hospital inpatient care at Foundations' inpatient psychiatric facility was medically necessary.[3] For the reasons set forth below, we now affirm.

Prior to his admission into Foundations' inpatient psychiatric facility, S.D. had run away from his father's residence in New Jersey to reunite with his mother in Philadelphia. (R.R. at 5.) Subsequently, police captured S. D., and Foundations admitted him into its inpatient psychiatric facility on April 30, 2010, based on suicidal and homicidal concerns. (*Id.*) S.D. remained at Foundations' inpatient psychiatric facility until August 27, 2010. (*Id.*) Private insurance covered the costs of S.D.'s hospitalization from April 30, 2010, through May 17, 2010. (*Id.*) From May 18, 2010, through August 27, 2010, DPW paid for S.D.'s hospitalization. (*Id.*)

On December 22, 2011, BPI issued a letter to Foundations, notifying Foundations that, *inter alia,* it was denying reimbursement retrospectively to Foundations at the level requested for the admission of S.D. from June 11, 2010, until August 27, 2010. (*Id.* at 5, 68, 70.) BPI based its decision to deny reimbursement to Foundations for this time period on BPI's determination that the medical record for S.D. lacked documentation to justify the medical necessity for continued acute short-term inpatient hospitalization, and that by June 11, 2010, an alternate, lesser level of care was appropriate for S.D. (*Id.* at 5, 68.) BPI also determined that the medical record lacked documentation that discharge planning for placement was adequate or performed in a timely manner. (*Id.* at 68.) Consequently, BPI concluded that Foundations had violated numerous MA regulations and, thus, was not entitled to reimbursement. (*Id.* at 5, 68, 70.)

Foundations appealed BPI's determination on January 20, 2012. Foundations indicated that it was appealing because S.D.'s medical record established that it was medically necessary to provide S.D. with acute inpatient mental health care until July 23, 2010. (*Id.* at 73.) The ALJ held an evidentiary hearing on March 7, 2012, at which representatives of both Foundations and DPW testified. Lina Atkinson, M.S.N., testified on behalf of Foundations in her capacity as nurse executive. Ms. Atkinson admitted that although S.D. was voluntarily admitted to Foundations' inpatient psychiatric facility on April 30, 2010, and was discharged on August 27, 2010, Foundations was concerned only about obtaining reimbursement for June 11, 2010, to July 23, 2010. (*Id.* at 17, 23, 28–31, 37.) Ms. Atkinson further explained that, as of July 23, 2010, Foundations no longer believed that acute inpatient hospital care was medically necessary for S.D. At that point, he was waiting for a bed at a residential facility. Until that

---

mined was the date of S.D.'s discharge. (R.R. at 5.) It appears that BPI intended to deny reimbursement to Foundations for the care it rendered to S.D. from June 11, 2010, until the date of S.D.'s discharge from Foundations' inpatient psychiatric facility in August, whatever that exact date may be. As evidenced later in this Opinion, the exact date of S.D.'s discharge from Foundations' inpatient psychiatric facility is immaterial for purposes of disposing of the issues on appeal.

3. DPW is the state agency that administers Pennsylvania's Medical Assistance (MA) program and, as such, DPW is responsible for providing medical benefits to the poor in Pennsylvania. *Commonwealth v. TAP Pharm. Prods., Inc.,* 36 A.3d 1112, 1122–23 (Pa. Cmwlth.2011). BPI is tasked with conducting retrospective reviews of MA recipients' admissions into hospitals for compliance with MA regulations. (R.R. at 67.) As part of this process, BPI performs medical record reviews to ensure payment information agrees with the medical record documentation. (*Id.*)

point, however, the inpatient psychiatric treatment Foundations rendered to S.D. was medically necessary.[4] (*Id.* at 17, 29–31.) Ms. Atkinson also testified that though it was rare for any child to be on elopement precautions for a long period of time, the attending doctor in S.D.'s case had S.D. on elopement precautions because S.D. was a homicidal threat in the community. (*Id.* at 30–31.) Ms. Atkinson further explained that Foundations believed that up until July 23, 2010, S.D. was a risk and a danger to himself, such that S.D. could not be discharged to a lower level of care.[5] (*Id.* at 31.)

Elaine Douglas, M.D., testified on behalf of DPW at the hearing. Dr. Douglas, a board certified psychiatrist employed as a consultant for DPW, testified that the insurance company which paid for the first part of S.D.'s stay at Foundations' inpatient psychiatric facility stopped paying after May 17, 2010, because it believed that S.D. was ready for discharge and appropriate for outpatient care as of that date.[6] (*Id.* at 44–45.) Dr. Douglas explained that DPW then picked up the case. (*Id.* at 45.) Dr. Douglas testified that in evaluating the case for medical necessity, it was pretty clear that S.D. was improving in late May or early June. (*Id.* at 48.) Dr. Douglas indicated that upon evaluation of S.D. on May 12, 2010, it was determined that he needed to go to a residential treatment facility (RTF). (*Id.*) Dr. Douglas further explained that Foundations was trying to find an RTF at which to place S. D., but that such placement had to be in New Jersey. (*Id.*) Dr. Douglas testified that on June 7, 2010, the therapist was told that S.D. was being denied a facility placement due to the inability to do a face-to-face assessment. (*Id.*) Dr. Douglas also testified that Foundations was notified that transferring S.D. to a New Jersey acute hospital would expedite placement in a New Jersey RTF, but that there was no indication that Foundations pursued this option. (*Id.* at 49–50.) Dr. Douglas indicated that a contact interview was eventually performed on June 10, 2010, and that S.D.'s name was put on a waiting list, where it remained for months. (*Id.* at 49.) Dr. Douglas testified that, as a result of being placed on the waiting list and his desire to leave Foundations' inpatient psychiatric facility, S.D. became irritable and began to act out. (*Id.* at 49–51.) Dr. Douglas further testified that S.D. was eventually told that he was nearing the end of the waiting list, but that on August 11, 2010, the therapist learned that because S.D.'s father had left New Jersey and returned to Pennsylvania, S.D. could no longer be placed in New Jersey. (*Id.* at 50–51.) As a result, Foundations was able to discharge S.D. to its own RTF facility in Pennsylvania. (*Id.* at 51.)

According to Dr. Douglas, it was BPI's position that when Foundations was told to

4. Ms. Atkinson noted that the medical record documentation clearly demonstrated that S.D. was suicidal, homicidal, and a high risk for elopement and assault from June 11, 2010, to July 23, 2010, and that after that point, the documentation was "sporadic[,] on and off." (R.R. at 37.)

5. Nicole Rufe, a licensed professional counselor, also testified at the hearing on behalf of Foundations, regarding the circumstances that precipitated S.D.'s admission into Foundations' inpatient psychiatric facility. (R.R. at 33–34.) Rashida Akter, M.D., a board certified behavioral psychiatrist, testified as to S.D.'s treatment from July 26, 2010, until S.D.'s discharge. (*Id.* at 35–36.) Susan Gurman, M.S., Grievance and Appeals Manager, attended the hearing on behalf of Foundations, but she did not testify.

6. At the hearing, Dr. Douglas stipulated that the time period at issue in the appeal was from June 11, 2010, through July 23, 2010. (R.R. at 25.)

transfer S.D. to a New Jersey hospital and Foundations made no attempt to do so, DPW no longer had to pay for S.D.'s stay at Foundations' inpatient psychiatric facility. (*Id.* at 52.) In her closing statement, Dr. Douglas reiterated that S.D.'s behavioral issues were due to his frustration about his lengthy stay at Foundations' inpatient psychiatric facility. (*Id.* at 62.) Dr. Douglas further indicated that it was not medically necessary to keep S.D. in an inpatient psychiatric unit, which is the highest level of psychiatric care, during the time period at issue. (*Id.*) Dr. Douglas stated that from BPI's perspective, Foundations was actively searching for a bed for S.D. as of June 11, 2010, and that S.D. would have been discharged at that time had a bed been available. (*Id.*)

Following the hearing, the ALJ issued an adjudication and accompanying recommendation to deny Foundations' appeal. In so doing, the ALJ determined, most relevantly, that (1) Foundations indicated that it was only appealing the admission period of June 11, 2010, through July 23, 2010; (2) a graph that Foundations introduced at the hearing documenting S.D.'s care at Foundations' inpatient psychiatric facility reflected dates that were after S.D.'s discharge date of August 27, 2010;[7] and (3) Foundations failed to provide sufficient documentation that S.D.'s admission for the period of June 11, 2010, through August 27, 2010, was medically necessary. (*Id.* at 5.)

The ALJ reasoned that the graph, which was purported to be a transcription of S.D.'s physician notes in order to justify S.D.'s stay at Foundations' inpatient psychiatric facility from June 11, 2010, to July 23, 2010, was a flawed and unacceptable verification of medical necessity in several respects. (*Id.* at 9.) The ALJ noted that a transcript of the physician's notes is not the best evidence under the applicable regulations. (*Id.*) The ALJ also reasoned that the transcription was incompetent on its face, because it was dated June 11, *2011*, through July 25, *2011*, dates that were after S.D.'s date of discharge. The ALJ further noted that even if the transcribed document was reviewed under the premise that the dates should have read 2010 instead of 2011, it contained contradictory evaluations. (*Id.*) The ALJ indicated that one entry under the heading of "Physician Documentation" provided: "Rated high risk suicide, homicide, elopement, & assault." (*Id.* at 9, 77.) The ALJ noted that another entry under the heading of "Nurse/Therapist" made on the same date provided: "[P]hone interview Children's Home in New Jersey. Waiting list. Maybe two weeks for opening." (*Id.*) The ALJ reasoned that based on those remarks, it appeared that S.D. was considered dangerous and not ready for discharge while simultaneously on a waiting list for a vacancy as indicated by Dr. Douglas. (*Id.* at 9.) The ALJ indicated that under DPW's regulations, Foundations failed to provide adequate documentation to justify S.D.'s continued care at Foundations' inpatient psychiatric facility after June 10, 2010. (*Id.*) Thus, the ALJ concluded that based on the facts, testimony, and evidence submitted, DPW was correct to deny payment retrospectively to Foundations for the period of June 11, 2010, through August 27, 2010. (*Id.*) By order dated April 13, 2012, BHA adopted the ALJ's recommendation. (*Id.* at 1.) Foundations then petitioned this Court for review.[8]

---

7. DPW also admitted S.D.'s medical record into evidence at the hearing. (R.R. at 60.)

8. Foundations also filed an application/petition for reconsideration with the Secretary of DPW, and a petition for review with this Court on May 10, 2012. The Secretary grant-

■ On appeal,[9] Foundations essentially argues that BHA erred in concluding that Foundations is not entitled to reimbursement for the care it rendered to S.D. from June 11, 2010, to August 27, 2010, because BHA's determination that Foundations failed to provide sufficient documentation that S.D.'s admission during that time was medically necessary is not supported by substantial evidence.[10] Although Foundations argues that it provided medically necessary care to S.D. during S.D.'s entire stay at Foundations' inpatient psychiatric facility, it divides S.D.'s stay into two time periods and makes separate arguments as to why it is entitled to reimbursement and the proper reimbursement rate to be applied for each time period. Thus, we address these time periods and corresponding arguments in turn.

Foundations first argues that it is entitled to reimbursement for the care it provided to S.D. from June 11, 2010, to July 23, 2010. Foundations contends that it was medically necessary to provide S.D. with inpatient care for this time period, and that S.D.'s medical record is replete with documentation evidencing this need and S.D.'s receipt of such care. Foundations also notes that the record documents

ed the application/petition by order dated June 19, 2012, (R.R. at 66), although the Secretary did not subsequently issue a ruling on this matter. We note, however, that 1 Pa.Code § 35.241(e), provides for a shortened period for an agency to act on an application for reconsideration when judicial review is sought. It provides, in part, that "if a party files a timely petition for review of an adjudication ..., the agency may grant an application for ... reconsideration only within the time prescribed by Pa. R.A.P. No. 1512 (relating to time for petitioning for review)." 1 Pa.Code § 35.241(e). Pursuant to Pa. R.A.P. 1512(a), a party must file petition for review within thirty days after the entry of a final order for it to be timely. If the Secretary fails to act on the application/petition within that time period, "the application shall be deemed to have been denied." Id. The regulation further provides that "[u]nder Pa. R.A.P. No. 1512, the time prescribed for the filing of a petition for review is measured from the date of entry of the original adjudication or other final order and not from the date of filing of the application for rehearing or reconsideration." Id. Thus, the Secretary lacked jurisdiction to grant the application/petition for reconsideration on June 19, 2012. Nevertheless, the timeliness of the Secretary's granting of the application/petition for reconsideration is of no consequence to the matter now before the Court.

9. As this Court has previously stated:

> In reviewing a DPW decision to deny reimbursement under the MA program, this Court's scope of review is limited to deter-

mining whether any constitutional rights were violated, whether there was an error of law, or whether essential findings of fact are supported by substantial evidence. "Substantial evidence" is evidence which outweighs inconsistent evidence and which a reasonable person would accept as adequate to support a conclusion. In addition, it is within the discretion of the fact-finder to make credibility determinations and these determinations will not be disturbed on appeal.

*Mazzitti & Sullivan Counseling Servs., Inc. v. Dep't of Pub. Welfare,* 7 A.3d 875, 882 n. 5 (Pa.Cmwlth.2010) (citations omitted), *appeal denied,* 611 Pa. 628, 23 A.3d 543 (2011).

10. Foundations also argues that DPW's denial of reimbursement for the care Foundations provided to S.D. constitutes a regulatory taking in violation of Article I, Section 1 of the Pennsylvania Constitution and the Fourteenth Amendment to the United States Constitution. Foundations contends that this denial wrongfully imposes on Foundations a financial responsibility of the public and DPW under the MA program, and that in the interests of fairness and justice, DPW must pay Foundations appropriately. Because Foundations failed to raise this issue below, it is waived. *See K.J. v. Dep't of Pub. Welfare,* 767 A.2d 609, 612 (Pa.Cmwlth.) ("Our case law is unwavering that when a party fails to raise an issue, even one of a constitutional dimension, in an agency proceeding, the issue is waived and cannot be considered for the first time in a judicial appeal."), *appeal denied,* 567 Pa. 750, 788 A.2d 381 (2001).

Foundations' good faith efforts to place S.D. at an appropriate lower care facility and the unavailability of such a facility as of June 11, 2010. Foundations alleges that BHA ignored S.D.'s medical record and the hearing testimony evidencing S.D.'s continuing need for and receipt of care and the lack of an alternative treatment placement, as well as the applicable regulations and case law entitling Foundations to reimbursement. Foundations contends that BHA instead relied on a single notation found in the graph Foundations submitted during the hearing as proof that as of June 11, 2010, S.D. was ready to be discharged and an alternative treatment placement was actually available for him. Foundations argues that the mere planning for the transfer of a patient to a lesser care facility is not indicative of the care the patient actually needs or is receiving at the time of such planning. Foundations also contends that DPW produced no evidence contradicting Foundations' showing of S.D.'s actual need for and receipt of medically necessary inpatient care for this time period or the lack of an available RTF placement prior to S.D.'s discharge in August. Thus, Foundations requests payment at the applicable inpatient hospital rate for the care it provided to S.D. from June 11, 2010, through July 22, 2010.

The regulations governing DPW's payment for inpatient psychiatric services rendered by a provider to MA recipients are found in Title 55, Chapter 1151 of the Pennsylvania Code. 55 Pa.Code §§ 1151.1–

.101. "The MA [p]rogram provides payment for medically necessary inpatient services rendered to eligible recipients by enrolled inpatient psychiatric facilities. Payment is made subject to [Chapter 1151] and Chapter 1101 (relating to general provisions)." *Id.* § 1151.1. Pursuant to Section 1101.61 of the regulations, DPW "will only pay for medically necessary compensable services." *Id.* § 1101.61; *see also id.* § 1101.66(a)(2) ("DPW pays for compensable services or items rendered, prescribed or ordered by a practitioner or provider if the service or item is: ... [m]edically necessary."). The regulations define "medically necessary" as follows:

*Medically necessary*—A service, item, procedure or level of care that is:

(i) Compensable under the MA Program.

(ii) Necessary to the proper treatment or management of an illness, injury or disability.

(iii) Prescribed, provided or ordered by an appropriate licensed practitioner in accordance with accepted standards of practice.

*Id.* § 1101.21.[11] Pursuant to Section 1101.51(e)(1)(x) of the regulations, providers must keep patient records that "contain documentation of the medical necessity of a rendered, ordered or prescribed service." *Id.* § 1101.51(e)(1)(x).

Here, at the hearing before the ALJ, Ms. Atkinson stated that Foundations was

---

11. The term has been further clarified as follows:

A service, item, procedure or level of care that is necessary for the proper treatment or management of an illness, injury or disability is one that:

(1) Will, or is reasonably expected to, prevent the onset of an illness, condition, injury or disability.

(2) Will, or is reasonably expected to, reduce or ameliorate the physical, mental or developmental effects of an illness, condition, injury or disability.

(3) Will assist the recipient to achieve or maintain maximum functional capacity in performing daily activities, taking into account both the functional capacity of the recipient and those functional capacities that are appropriate of recipients of the same age.

55 Pa.Code § 1101.21a.

entitled to reimbursement because S.D.'s stay at Foundations' inpatient psychiatric facility was medically necessary from June 11, 2010, to July 23, 2010. (R.R. at 29–31.) Ms. Atkinson further testified that until July 23, 2010, S.D. could not be discharged to a lower level of care as a result of the conditions from which S.D. was suffering. (R.R. at 31.) Despite these contentions, however, Ms. Atkinson failed to provide testimony as to *specific methods of care or treatment* Foundations provided to S.D. and *why* those methods were medically necessary for the treatment of those conditions during the time period at issue. In other words, Ms. Atkinson testified that because the record clearly indicated that S.D. suffered from certain conditions, S.D.'s stay at Foundations' inpatient psychiatric facility and the care rendered there (whatever that care might have been) was medically necessary. No representatives of Foundations pointed the ALJ to specific points in S.D.'s medical record, showing the treatment Foundations provided to S.D. and establishing that said treatment was medically necessary. Likewise, the chart submitted into the record at the hearing fails to demonstrate what treatment Foundations provided to S.D. and establish that the treatment was medically necessary. Instead, the chart largely references particular actions of S. D., the conditions from which S.D. was suffering, and risk assessments of S.D. on certain dates. (R.R. at 77–82.)

■ On appeal to this Court, Foundations again fails to cite to the hearing testimony or medical record demonstrating that Foundations provided medically necessary treatment to S.D. from June 11, 2010, to July 23, 2010. No such references appear in Foundations' petition for review. In its brief, Foundations merely asserts that S.D.'s medical record contains ample documentation evidencing that his treatment at Foundations' inpatient psychiatric facility was medically necessary, "as reflected in his treatment plan updates, primary therapist progress notes, interdisciplinary team progress notes, psychiatric daily and weekend progress notes, mental health technician progress notes, and group therapy progress notes." (Foundations' Br. at 10.) Upon review, however, we conclude that S.D.'s medical record also fails to demonstrate that S.D.'s treatment at Foundations' inpatient psychiatric facility was medically necessary. As noted by Dr. Douglas, the treatment plan updates and progress notes "simply document[ ] what [S.D.] was doing and saying," (*id.* at 49), rather than the actual treatment Foundations was providing to S.D. and why that treatment was medically necessary. The medical record also contains references to the circumstances surrounding S.D.'s discharge, particularly S.D.'s prolonged placement on the waitlist for transfer to the Children's Home of New Jersey and S.D.'s frustration regarding his length of stay at Foundations' inpatient psychiatric facility. These notations indicate that Foundations repeatedly postponed S.D.'s discharge date, and that it did so not because S.D. required continued inpatient hospital care, but because S.D. continued to remain on the waitlist for transfer to the Children's Home of New Jersey. Thus, based upon our review of the record and the ALJ's reasoning (as adopted by BHA) previously discussed, we conclude that BHA's finding that Foundations failed to provide sufficient documentation that S.D.'s admission to Foundations' inpatient psychiatric facility was medically necessary, as it applies to the time period of June 11, 2010, to July 23, 2010, is supported by substantial evidence. BHA, therefore, did not err in denying Foundations reimbursement for that time

period.[12]

■ Next, Foundations argues that it provided medically necessary care to S.D. from July 23, 2010, through S.D.'s date of discharge from Foundations' inpatient psychiatric facility in August 2010. Foundations notes that although it conceded before the ALJ that S.D. may no longer have qualified for inpatient care and treatment as of July 23, 2010, it is undisputed that S.D. needed residential care and treatment after that date. Foundations, therefore, asserts that under Section 1151.48(a)(10) of DPW's regulations,[13] DPW is obligated to

12. As previously discussed, Foundations notes that the record shows that it made a good faith effort to place S.D. at an alternate care facility and that such a facility was not available. We note that if it was indeed medically necessary for Foundations to provide S.D. with inpatient psychiatric care from June 11, 2010, to July 23, 2010, such that he could not be discharged to a lower care facility, as Foundations argues, the availability of a lower care facility would be immaterial for purposes of determining Foundations' reimbursement eligibility for that time period. Moreover, if Foundations was keeping S.D. at its inpatient psychiatric facility during this time period simply because he needed some form of care, albeit not inpatient psychiatric care, and no lesser treatment facilities were available despite Foundations' good faith efforts to locate one, we have previously held that these circumstances do not warrant reimbursement in a similar context. *See Mercy Hosp. v. Dep't of Pub. Welfare*, 89 Pa.Cmwlth. 192, 492 A.2d 104, 107 (1985) (denying reimbursement to acute care facility despite facility's good faith effort to transfer patient who no longer needed acute care to another facility, concluding that "the issue is not whether [the acute care facility] had made a diligent effort to transfer [the patient,] but whether the hospital complied with DPW regulations"); *Easton Hosp. v. Dep't of Pub. Welfare*, 76 Pa.Cmwlth. 39, 463 A.2d 94, 95–96 (1983) (denying reimbursement at lower rate to acute care facility for care rendered to patients remaining at facility due to unavailability of hospital beds at lower care facilities, noting "that reimbursement is not dependent upon the level of care for which reimbursement is being sought, but rather upon compliance with the standards established by th[e applicable] regulation"); *Temple Univ. v. Dep't of Pub. Welfare*, 47 Pa.Cmwlth. 22, 407 A.2d 92, 93–94 (1979) (upholding DPW regulation governing reimbursement to hospitals providing care to MA patients for whom some care, though not acute care, is necessary and for whom no space at lower care

facility is available, noting that regulation did not provide DPW with discretion to deny reimbursement and that reimbursement is made only at rate established for particular service and only when care is provided by a facility certified to provide that service), *aff'd*, 490 Pa. 207, 415 A.2d 413, *appeal dismissed*, 449 U.S. 1005, 101 S.Ct. 555, 66 L.Ed.2d 464 (1980). *But see Dep't of Pub. Welfare v. Temple Univ.*, 21 Pa.Cmwlth. 162, 343 A.2d 701, 704 (1975) (holding that under regulation giving DPW discretion to determine reimbursement to hospitals in cases where patient no longer needs acute care but does need lower level of care, it was abuse of that discretion for DPW to deny reimbursement to hospitals which make diligent effort to locate lesser care facility placement for patients). Foundations did not argue that it was entitled to reimbursement at a lower rate for the care it rendered to S.D. from June 11, 2010, to July 23, 2010, until oral argument before this Court. Foundations also did not challenge below BPI's determination that the medical record lacked documentation that discharge planning for placement was adequate or performed in a timely manner. Thus, these issues are waived. *See M.T. v. Dep't of Educ.*, 56 A.3d 1, 10 n. 12 (Pa.Cmwlth.2010) ("The failure of a party properly to raise and preserve an issue before an administrative agency results in waiver of that issue before this Court."); *Van Duser v. Unemployment Comp. Bd. of Review*, 164 Pa.Cmwlth. 96, 642 A.2d 544, 548 n. 3 (1994) ("Issues not briefed are waived."). Furthermore, given the precedent cited above, it is not readily apparent that such a claim would be successful under DPW's regulations applicable to this matter. *See* 55 Pa.Code § 1151.48 (outlining noncompensable services and items for inpatient psychiatric facilities).

13. Section 1151.48(a)(10) of the regulations provides:

(a) [DPW] will not pay an inpatient psychiatric facility for:

pay for the lesser level of care provided by Foundations' inpatient psychiatric facility. Specifically, Foundations argues that because S.D. received undisputedly medically necessary care while S.D.'s placement at an alternative care facility was pending, Foundations qualifies for payment at the applicable RTF rate for the care provided to S.D. from July 23, 2010 through S.D.'s date of discharge in August 2010.

Notably, Foundations did not object to BPI's denial of reimbursement for the care Foundations rendered to S.D. from July 23, 2010, through S.D.'s August discharge date in its letter of appeal to BHA or at the hearing before the ALJ. In now arguing that it did not waive its right to claim reimbursement at a lower rate for this time period, Foundations explains that it did not make this claim below because it believed that it could not claim *any* payment for the services Foundations provided to S.D. for that time period as a result of discussions Foundations and BPI engaged in prior to the issuance of BPI's letter, dated December 22, 2011. Foundations contends that it advised the ALJ that its appeal from BPI's denial of reimbursement covered only the period of June 11, 2010, through July 23, 2010, because it was unaware that it had a right to payment at a lesser reimbursement rate, it was unfamiliar with the administrative process, and it previously informed BPI that it would not contest the denial of need for inpatient care as of July 23, 2010. Foundations notes that it challenges BPI's denial of reimbursement from June 11, 2010, through August 27, 2010, in its petition for

review, and Foundations argues that the omission below of the time period of July 23, 2010, to August 27, 2010, is harmless error. Foundations further contends that the inclusion of those days in the appeal to this Court does not prejudice DPW, and that it would be manifestly unjust, inequitable, and contrary to 42 C.F.R. § 413.9(c) (providing, in part, that "[i]t is the intent of Medicare that payments to providers of services should be fair to the providers") to exclude that time period from the appeal.

We conclude that Foundations did waive its right to seek *any* reimbursement for the care Foundations provided to S.D. from July 23, 2010, through S.D.'s August discharge date. Pursuant to Pennsylvania Rule of Appellate Procedure 1551(a), "[n]o question shall be heard or considered by the court which was not raised before the government unit."[14] *See also M.T. v. Dep't of Educ.*, 56 A.3d 1, 10 n. 12 (Pa. Cmwlth.2010) (failure of party to raise issue before administrative agency results in waiver). Foundations concedes that it raises its challenge to BPI's denial of reimbursement for the time period of July 23, 2010, to August 27, 2010, for the first time on appeal to this Court. Furthermore, the record reveals multiple instances in which Foundations explicitly limits its challenge to BPI's denial of reimbursement to the dates of June 11, 2010, to July 23, 2010. Specifically, in its written appeal from BPI's letter, Foundations indicated that it was requesting a hearing because it believed that S.D.'s medical record supports medical necessity for the time period of

. . . .

(10) Days of care for recipients who no longer require psychiatric inpatient care. [DPW] does make payment to an inpatient psychiatric facility for skilled nursing or intermediate care provided for a recipient in a certified bed in a certified and approved hospital-based skilled nursing or intermediate care unit in accordance with Chapter 1181 (relating to nursing facility care) or successor provisions.

55 Pa.Code § 1151.48(a)(10).

14. This rule is subject to exceptions that are not applicable to this matter. *See* Pa.R.A.P. 1551(a)(1)-(3).

June 11, 2010, to July 23, 2010, but that Foundations agreed that from July 23, 2010, onward, S.D. "was able to contract for safety and became a dispositional issue." (R.R. at 73.) Furthermore, at the hearing before the ALJ, Ms. Atkinson repeatedly indicated that Foundations was only contesting BPI's denial of reimbursement from June 11, 2010, to July 23, 2010. (*Id.* at 17, 23, 29–31, 37.) Dr. Douglas stipulated that June 11, 2010, to July 23, 2010, were the dates at issue, and the ALJ noted that all parties were in accord with regard to the time period for which Foundations was contesting BPI's denial of reimbursement. (*Id.* at 25.) Finally, in a faxed letter sent after the hearing, Foundations again indicated that it was "only requesting reimbursement for the time frame [of] June 11[, 2010]–July 23, 2010." (*Id.* at 76.)

Moreover, Foundations' claim that it was unfamiliar with the administrative process is without merit. As a health care provider, Foundations "is charged with knowledge of applicable DPW regulations," which would include those governing the appeal process. *See Del Borrello v. Dep't of Pub. Welfare,* 96 Pa.Cmwlth. 507, 508 A.2d 368, 371 (1986); *Divine Providence Hosp. v. Dep't of Pub. Welfare,* 76 Pa.Cmwlth. 188, 463 A.2d 118, 120 (1983). Foundations was notified of its right to appeal BPI's decision and how to do so in the letter issued by BPI on December 22, 2011. (R.R. at 68–69.) Furthermore, to the extent that Foundations' argument is based on the fact that Foundations was unrepresented by counsel below, the principles of waiver apply to parties acting *pro se.* *See Griffith v. Workers'*

*Comp. Appeal Bd. (New Holland N. Am., Inc.),* 798 A.2d 324, 328 (Pa.Cmwlth.2002). We conclude, therefore, that Foundations waived its right to seek reimbursement for the care it rendered to S.D. from July 23, 2010, until S.D.'s discharge from Foundations' inpatient psychiatric facility in August 2010.[15]

Accordingly, we affirm the order of BHA.

### ORDER

AND NOW, this 5th day of August, 2013, the order of the Department of Public Welfare, Bureau of Hearings and Appeals, is hereby AFFIRMED.

---

**15.** As for Foundations' contention that it was unaware of its right to reimbursement at a lower rate, we note that, as discussed previously, it is unclear that Foundations has such a right. Nevertheless, because we conclude that Foundations has waived its ability to

claim *any* reimbursement for the care it rendered to S.D. from July 23, 2010, to S.D.'s date of discharge in August 2010, we need not address here whether Foundations can claim reimbursement at a lower rate for this time period.